HARRIS, SECRETARY OF HEALTH AND HUMAN
SERVICES *v.* McRAE ET AL.

No. 79–1268.   Argued April 21, 1980—Decided June 30, 1980

298

Stewart, J., delivered the opinion of the Court, in which Burger. C. J., and White, Powell, and Rehnquist, JJ., joined. White, J. filed a concurring opinion, *post*, p. 327. Brennan, J., filed a dissenting opinion, in which Marshall and Blackmun, JJ., joined, *post*, p. 329. Marshall,

J., *post*, p. 337, BLACKMUN, J., *post*, p. 348, and STEVENS, J., *post*, p. 349, filed dissenting opinions.

*Solicitor General McCree* argued the cause for appellant. With him on the briefs were *Assistant Attorney General Daniel* and *Eloise E. Davies. Victor G. Rosenblum, Dennis J. Horan, John D. Gorby, Carl Anderson, Patrick A. Trueman, A. Lawrence Washburn, Jr.,* and *Gerald E. Bodell* filed briefs for Buckley et al., appellees under this Court's Rule 10 (4), in support of appellant.

*Rhonda Copelon* argued the cause for appellees McRae et al. With her on the briefs were *Nancy Stearns, Sylvia Law, Ellen K. Sawyer, Janet Benshoof, Judith Levin, Harriet Pilpel,* and *Eve Paul.**

MR. JUSTICE STEWART delivered the opinion of the Court.

This case presents statutory and constitutional questions concerning the public funding of abortions under Title XIX of the Social Security Act, commonly known as the "Medicaid" Act, and recent annual Appropriations Acts containing

---

*Briefs of *amici curiae* urging reversal were filed by *John T. Noonan, Jr.,* and *William B. Ball* for Representative Jim Wright et al.; and by *Wilfred R. Caron* and *Patrick F. Geary* for the United States Catholic Conference.

Briefs of *amici curiae* urging affirmance were filed by *Robert Abrams,* Attorney General, *Shirley Adelson Siegel,* Solicitor General, and *Peter Bienstock, Arnold D. Fleischer,* and *Barbara E. Levy,* Assistant Attorneys General, for the State of New York et al., joined by *Rufus L. Edmisten,* Attorney General of North Carolina, *William F. O'Connell,* Special Deputy Attorney General, and *Steven Mansfield Shaber,* Associate Attorney General, and *James A. Redden,* Attorney General of Oregon; by *Leo Pfeffer* for the American Ethical Union et al.; by *Barbara Ellen Handschu* for the Association of Legal Aid Attorneys of the City of New York—District 65—U. A. W. et al.; and by *Phyllis N. Segal* and *Judith I. Avner* for the National Organization for Women et al.

Briefs of *amici curiae* were filed by *Nadine Taub* for the Bergen-Passaic Health Systems Agency et al.; by *James G. Kolb* for the Coalition for Human Justice; by *Sanford Jay Rosen* for the National Council of Churches of Christ in the U. S. A.; and by *Sanford Jay Rosen* for the United Presbyterian Church in the U. S. A.

the so-called "Hyde Amendment." The statutory question is whether Title XIX requires a State that participates in the Medicaid program to fund the cost of medically necessary abortions for which federal reimbursement is unavailable under the Hyde Amendment. The constitutional question, which arises only if Title XIX imposes no such requirement, is whether the Hyde Amendment, by denying public funding for certain medically necessary abortions, contravenes the liberty or equal protection guarantees of the Due Process Clause of the Fifth Amendment, or either of the Religion Clauses of the First Amendment.

## I

The Medicaid program was created in 1965, when Congress added Title XIX to the Social Security Act, 79 Stat. 343, as amended, 42 U. S. C. § 1396 *et seq.* (1976 ed. and Supp. II), for the purpose of providing federal financial assistance to States that choose to reimburse certain costs of medical treatment for needy persons. Although participation in the Medicaid program is entirely optional, once a State elects to participate, it must comply with the requirements of Title XIX.

One such requirement is that a participating State agree to provide financial assistance to the "categorically needy" [1] with respect to five general areas of medical treatment: (1) inpatient hospital services, (2) outpatient hospital services, (3) other laboratory and X-ray services, (4) skilled nursing

---

[1] The "categorically needy" include families with dependent children eligible for public assistance under the Aid to Families with Dependent Children program, 42 U. S. C. § 601 *et seq.,* and the aged, blind, and disabled eligible for benefits under the Supplemental Security Income program, 42 U. S. C. § 1381 *et seq.* See 42 U. S. C. § 1396a (a)(10)(A). Title XIX also permits a State to extend Medicaid benefits to other needy persons, termed "medically needy." See 42 U. S. C. § 1396a (a)(10)(C). If a State elects to include the medically needy in its Medicaid plan, it has the option of providing somewhat different coverage from that required for the categorically needy. See 42 U. S. C. § 1396a (a)(13)(C).

facilities services, periodic screening and diagnosis of children, and family planning services, and (5) services of physicians. 42 U. S. C. §§ 1396a (a)(13)(B), 1396d (a)(1)–(5). Although a participating State need not "provide funding for all medical treatment falling within the five general categories, [Title XIX] does require that [a] state Medicaid pla[n] establish 'reasonable standards . . . for determining . . . the extent of medical assistance under the plan which . . . are consistent with the objectives of [Title XIX].' 42 U. S. C. § 1396a (a)(17)." *Beal* v. *Doe,* 432 U. S. 438, 441.

Since September 1976, Congress has prohibited—either by an amendment to the annual appropriations bill for the Department of Health, Education, and Welfare[2] or by a joint resolution—the use of any federal funds to reimburse the cost of abortions under the Medicaid program except under certain specified circumstances. This funding restriction is commonly known as the "Hyde Amendment," after its original congressional sponsor, Representative Hyde. The current version of the Hyde Amendment, applicable for fiscal year 1980, provides:

> "[N]one of the funds provided by this joint resolution shall be used to perform abortions except where the life of the mother would be endangered if the fetus were carried to term; or except for such medical procedures necessary for the victims of rape or incest when such rape or incest has been reported promptly to a law enforcement agency or public health service." Pub. L. 96–123, § 109, 93 Stat. 926.

See also Pub. L. 96–86, § 118, 93 Stat. 662. This version of the Hyde Amendment is broader than that applicable for fiscal year 1977, which did not include the "rape or incest"

---

[2] The Department of Health, Education, and Welfare was recently reorganized and divided into the Department of Health and Human Services and the Department of Education. The original designation is retained for purposes of this opinion.

exception, Pub. L. 94–439, § 209, 90 Stat. 1434, but narrower than that applicable for most of fiscal year 1978,[3] and all of fiscal year 1979, which had an additional exception for "instances where severe and long-lasting physical health damage to the mother would result if the pregnancy were carried to term when so determined by two physicians," Pub. L. 95–205, § 101, 91 Stat. 1460; Pub. L. 95–480, § 210, 92 Stat. 1586.[4]

On September 30, 1976, the day on which Congress enacted the initial version of the Hyde Amendment, these consolidated cases were filed in the District Court for the Eastern District of New York. The plaintiffs—Cora McRae, a New York Medicaid recipient then in the first trimester of a pregnancy that she wished to terminate, the New York City Health and Hospitals Corp., a public benefit corporation that operates 16 hospitals, 12 of which provide abortion services, and others—sought to enjoin the enforcement of the funding restriction on abortions. They alleged that the Hyde Amendment violated the First, Fourth, Fifth, and Ninth Amendments of the Constitution insofar as it limited the funding of abortions to those necessary to save the life of the mother, while permitting the funding of costs associated with childbirth. Although the sole named defendant was the Secretary of Health, Education, and Welfare, the District Court permitted Senators James L. Buckley and Jesse A. Helms and Representative Henry J. Hyde to intervene as defendants.[5]

---

[3] The appropriations for HEW during October and November 1977, the first two months of fiscal year 1978, were provided by joint resolutions that continued in effect the version of the Hyde Amendment applicable during fiscal year 1977. Pub. L. 95–130, 91 Stat. 1153; Pub. L. 95–165, 91 Stat. 1323.

[4] In this opinion, the term "Hyde Amendment" is used generically to refer to all three versions of the Hyde Amendment, except where indicated otherwise.

[5] Although the intervenor-defendants are appellees in the Secretary's direct appeal to this Court, see this Court's Rule 10 (4), the term "appellees" is used in this opinion to refer only to the parties who were the plaintiffs in the District Court.

After a hearing, the District Court entered a preliminary injunction prohibiting the Secretary from enforcing the Hyde Amendment and requiring him to continue to provide federal reimbursement for abortions under the standards applicable before the funding restriction had been enacted. *McRae* v. *Mathews,* 421 F. Supp. 533. Although stating that it had not expressly held that the funding restriction was unconstitutional, since the preliminary injunction was not its final judgment, the District Court noted that such a holding was "implicit" in its decision granting the injunction. The District Court also certified the *McRae* case as a class action on behalf of all pregnant or potentially pregnant women in the State of New York eligible for Medicaid and who decide to have an abortion within the first 24 weeks of pregnancy, and of all authorized providers of abortion services to such women. *Id.,* at 543.

The Secretary then brought an appeal to this Court. After deciding *Beal* v. *Doe,* 432 U. S 438, and *Maher* v. *Roe,* 432 U. S. 464, we vacated the injunction of the District Court and remanded the case for reconsideration in light of those decisions. *Califano* v. *McRae,* 433 U. S. 916.

On remand, the District Court permitted the intervention of several additional plaintiffs, including (1) four individual Medicaid recipients who wished to have abortions that allegedly were medically necessary but did not qualify for federal funds under the versions of the Hyde Amendment applicable in fiscal years 1977 and 1978, (2) several physicians who perform abortions for Medicaid recipients, (3) the Women's Division of the Board of Global Ministries of the United Methodist Church (Women's Division), and (4) two individual officers of the Women's Division.

An amended complaint was then filed, challenging the various versions of the Hyde Amendment on several grounds. At the outset, the plaintiffs asserted that the District Court need not address the constitutionality of the Hyde Amend-

ment because, in their view, a participating State remains obligated under Title XIX to fund all medically necessary abortions, even if federal reimbursement is unavailable. With regard to the constitutionality of the Hyde Amendment, the plaintiffs asserted, among other things, that the funding restrictions violate the Religion Clauses of the First Amendment and the Due Process Clause of the Fifth Amendment.

After a lengthy trial, which inquired into the medical reasons for abortions and the diverse religious views on the subject,[6] the District Court filed an opinion and entered a judgment invalidating all versions of the Hyde Amendment on constitutional grounds.[7] The District Court rejected the plaintiffs' statutory argument, concluding that even though Title XIX would otherwise have required a participating State to fund medically necessary abortions, the Hyde Amendment had substantively amended Title XIX to relieve a State of that funding obligation. Turning then to the constitutional issues, the District Court concluded that the Hyde Amendment, though valid under the Establishment Clause,[8] violates the equal protection component of the Fifth Amendment's Due Process Clause and the Free Exercise Clause of the First Amendment. With regard to the Fifth Amendment, the District Court noted that when an abortion is "medically necessary to safeguard the pregnant woman's health, . . . the disentitlement to [M]edicaid assistance impinges directly on the woman's right to decide, in consultation with her physician and in reliance on his judgment, to terminate

---

[6] The trial, which was conducted between August 1977 and September 1978, produced a record containing more than 400 documentary and film exhibits and a transcript exceeding 5,000 pages.

[7] *McRae* v. *Califano*, 491 F. Supp. 630.

[8] The District Court found no Establishment Clause infirmity because, in its view, the Hyde Amendment has a secular legislative purpose, its principal effect neither advances nor inhibits religion, and it does not foster an excessive governmental entanglement with religion.

her pregnancy in order to preserve her health." [9] *McRae* v. *Califano*, 491 F. Supp. 630, 737. The court concluded that the Hyde Amendment violates the equal protection guarantee because, in its view, the decision of Congress to fund medically necessary services generally but only certain medically necessary abortions serves no legitimate governmental interest. As to the Free Exercise Clause of the First Amendment, the court held that insofar as a woman's decision to seek a medically necessary abortion may be a product of her religious beliefs under certain Protestant and Jewish tenets, the funding restrictions of the Hyde Amendment violate that constitutional guarantee as well.

Accordingly, the District Court ordered the Secretary to "[c]ease to give effect" to the various versions of the Hyde Amendment insofar as they forbid payments for medically necessary abortions. It further directed the Secretary to "[c]ontinue to authorize the expenditure of federal matching funds [for such abortions]." App. 87. In addition, the court recertified the *McRae* case as a nationwide class action on behalf of all pregnant and potentially pregnant women eligible for Medicaid who wish to have medically necessary abortions, and of all authorized providers of abortions for such women.[10]

The Secretary then applied to this Court for a stay of the judgment pending direct appeal of the District Court's decision. We denied the stay, but noted probable jurisdiction of this appeal. 444 U. S. 1069.

## II

It is well settled that if a case may be decided on either statutory or constitutional grounds, this Court, for sound

---

[9] The District Court also apparently concluded that the Hyde Amendment operates to the disadvantage of a "suspect class," namely, teenage women desiring medically necessary abortions. See n. 26, *infra*.

[10] Although the original class included only those pregnant women in the first two trimesters of their pregnancy, the recertified class included all pregnant women regardless of the stage of their pregnancy.

jurisprudential reasons, will inquire first into the statutory question. This practice reflects the deeply rooted doctrine "that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable." *Spector Motor Service, Inc.* v. *McLaughlin,* 323 U. S. 101, 105. Accordingly, we turn first to the question whether Title XIX requires a State that participates in the Medicaid program to continue to fund those medically necessary abortions for which federal reimbursement is unavailable under the Hyde Amendment. If a participating State is under such an obligation, the constitutionality of the Hyde Amendment need not be drawn into question in the present case, for the availability of medically necessary abortions under Medicaid would continue, with the participating State shouldering the total cost of funding such abortions.

The appellees assert that a participating State has an independent funding obligation under Title XIX because (1) the Hyde Amendment is, by its own terms, only a limitation on federal reimbursement for certain medically necessary abortions, and (2) Title XIX does not permit a participating State to exclude from its Medicaid plan any medically necessary service solely on the basis of diagnosis or condition, even if federal reimbursement is unavailable for that service.[11] It is thus the appellees' view that the effect of the Hyde Amendment is to withhold federal reimbursement for certain medically necessary abortions, but not to relieve a participating

---

[11] The appellees argue that their interpretation of Title XIX finds support in *Beal* v. *Doe,* 432 U. S. 438. There the Court considered the question whether Title XIX permits a participating State to exclude *non*-therapeutic abortions from its Medicaid plan. Although concluding that Title XIX does not preclude a State's refusal "to fund *unnecessary*—though perhaps desirable—medical services," the Court observed that "serious statutory questions might be presented if a state Medicaid plan excluded necessary medical treatment from its coverage." *Id.,* at 444–445 (emphasis in original). The Court in *Beal,* however, did not address the possible effect of the Hyde Amendment upon the operation of Title XIX.

State of its duty under Title XIX to provide for such abortions in its Medicaid plan.

The District Court rejected this argument. It concluded that, although Title XIX would otherwise have required a participating State to include medically necessary abortions in its Medicaid program, the Hyde Amendment substantively amended Title XIX so as to relieve a State of that obligation. This construction of the Hyde Amendment was said to find support in the decisions of two Courts of Appeals, *Preterm, Inc.* v. *Dukakis,* 591 F. 2d 121 (CA1 1979), and *Zbaraz* v. *Quern,* 596 F. 2d 196 (CA7 1979), and to be consistent with the understanding of the effect of the Hyde Amendment by the Department of Health, Education, and Welfare in the administration of the Medicaid program.

We agree with the District Court, but for somewhat different reasons. The Medicaid program created by Title XIX is a cooperative endeavor in which the Federal Government provides financial assistance to participating States to aid them in furnishing health care to needy persons. Under this system of "cooperative federalism," *King* v. *Smith,* 392 U. S. 309, 316, if a State agrees to establish a Medicaid plan that satisfies the requirements of Title XIX, which include several mandatory categories of health services, the Federal Government agrees to pay a specified percentage of "the total amount expended . . . as medical assistance under the State plan. . . ." 42 U. S. C. § 1396b (a)(1). The cornerstone of Medicaid is financial contribution by both the Federal Government and the participating State. Nothing in Title XIX as originally enacted, or in its legislative history, suggests that Congress intended to require a participating State to assume the full costs of providing any health services in its Medicaid plan. Quite the contrary, the purpose of Congress in enacting Title XIX was to provide federal financial assistance for all legitimate state expenditures under an approved Medicaid plan. See S. Rep. No. 404, 89th Cong., 1st

Sess., pt. 1, pp. 83–85 (1965); H. R. Rep. No. 213, 89th Cong., 1st Sess., 72–74 (1965).

Since the Congress that enacted Title XIX did not intend a participating State to assume a unilateral funding obligation for any health service in an approved Medicaid plan, it follows that Title XIX does not require a participating State to include in its plan any services for which a subsequent Congress has withheld federal funding.[12] Title XIX was designed as a cooperative program of shared financial responsibility, not as a device for the Federal Government to compel a State to provide services that Congress itself is unwilling to fund. Thus, if Congress chooses to withdraw federal funding for a particular service, a State is not obliged to continue to pay for that service as a condition of continued federal financial support of other services. This is not to say that Congress may not now depart from the original design of Title XIX under which the Federal Government shares the financial responsibility for expenses incurred under an approved Medicaid plan. It is only to say that, absent an indication of contrary legislative intent by a subsequent Congress, Title XIX does not obligate a participating State to pay for those medical services for which federal reimbursement is unavailable.[13]

---

[12] In *Preterm, Inc.* v. *Dukakis*, 591 F. 2d 121, 132 (CA1 1979), the opinion of the court by Judge Coffin noted:

"The Medicaid program is one of federal and state cooperation in funding medical assistance; a complete withdrawal of the federal prop in the system with the intent to drop the total cost of providing the service upon the states, runs directly counter to the basic structure of the program and could seriously cripple a state's attempts to provide other necessary medical services embraced by its plan." (Footnote omitted.)

[13] When subsequent Congresses have deviated from the original structure of Title XIX by obligating a participating State to assume the full costs of a service as a prerequisite for continued federal funding of other services, they have always expressed their intent to do so in unambiguous terms. See *Zbaraz* v. *Quern*, 596 F. 2d 196, 200, n. 12 (CA7 1979).

Thus, by the normal operation of Title XIX, even if a State were otherwise required to include medically necessary abortions in its Medicaid plan, the withdrawal of federal funding under the Hyde Amendment would operate to relieve the State of that obligation for those abortions for which federal reimbursement is unavailable.[14] The legislative history of the Hyde Amendment contains no indication whatsoever that Congress intended to shift the entire cost of such services to the participating States. See *Zbaraz* v. *Quern, supra,* at 200 ("no one, whether supporting or opposing the Hyde Amendment, ever suggested that state funding would be required"). Rather, the legislative history suggests that Congress has always assumed that a participating State would not be required to fund medically necessary abortions once federal funding was withdrawn pursuant to the Hyde Amendment.[15] See *Preterm, Inc.* v. *Dukakis, supra,* at 130 ("[t]he universal assumption in debate was that if the Amendment passed there would be no requirement that states carry on the service"). Accord, *Zbaraz* v. *Quern, supra,* at 200; *Hodgson* v. *Board of County Comm'rs,* 614 F. 2d 601, 612–613 (CA8

---

[14] Since Title XIX itself provides for variations in the required coverage of state Medicaid plans depending on changes in the availability of federal reimbursement, we need not inquire, as the District Court did, whether the Hyde Amendment is a substantive amendment to Title XIX. The present case is thus different from *TVA* v. *Hill,* 437 U. S. 153, 189–193, where the issue was whether continued appropriations for the Tellico Dam impliedly repealed the substantive requirements of the Endangered Species Act prohibiting the continued construction of the Dam because it threatened the natural habitat of an endangered species.

[15] Our conclusion that the Congress that enacted Title XIX did not intend a participating State to assume a unilateral funding obligation for any health service in an approved Medicaid plan is corroborated by the fact that subsequent Congresses simply assumed that the withdrawal of federal funding under the Hyde Amendment for certain medically necessary abortions would relieve a participating State of any obligation to provide for such services in its Medicaid plan. See the cases cited in the text, *supra.*

1980); *Roe* v. *Casey,* 623 F. 2d 829, 834–837 (CA3 1980). Accordingly, we conclude that Title XIX does not require a participating State to pay for those medically necessary abortions for which federal reimbursement is unavailable under the Hyde Amendment.[16]

### III

Having determined that Title XIX does not obligate a participating State to pay for those medically necessary abortions for which Congress has withheld federal funding, we must consider the constitutional validity of the Hyde Amendment. The appellees assert that the funding restrictions of the Hyde Amendment violate several rights secured by the Constitution—(1) the right of a woman, implicit in the Due Process Clause of the Fifth Amendment, to decide whether to terminate a pregnancy, (2) the prohibition under the Establishment Clause of the First Amendment against any "law respecting an establishment of religion," and (3) the right to freedom of religion protected by the Free Exercise Clause of the First Amendment. The appellees also contend that, quite apart from substantive constitutional rights, the Hyde Amendment violates the equal protection component of the Fifth Amendment.[17]

---

[16] A participating State is free, if it so chooses, to include in its Medicaid plan those medically necessary abortions for which federal reimbursement is unavailable. See *Beal* v. *Doe,* 432 U. S., at 447; *Preterm, Inc.* v. *Dukakis, supra,* at 134. We hold only that a State *need* not include such abortions in its Medicaid plan.

[17] The appellees also argue that the Hyde Amendment is unconstitutionally vague insofar as physicians are unable to understand or implement the exceptions in the Hyde Amendment under which abortions are reimbursable. It is our conclusion, however, that the Hyde Amendment is not void for vagueness because (1) the sanction provision in the Medicaid Act contains a clear scienter requirement under which good-faith errors are not penalized, see *Colautti* v. *Franklin,* 439 U. S. 379, 395, and, (2), in any event, the exceptions in the Hyde Amendment "are set out in terms that the ordinary person exercising ordinary common sense can

It is well settled that, quite apart from the guarantee of equal protection, if a law "impinges upon a fundamental right explicitly or implicitly secured by the Constitution [it] is presumptively unconstitutional." *Mobile* v. *Bolden*, 446 U. S. 55, 76 (plurality opinion). Accordingly, before turning to the equal protection issue in this case, we examine whether the Hyde Amendment violates any substantive rights secured by the Constitution.

## A

We address first the appellees' argument that the Hyde Amendment, by restricting the availability of certain medically necessary abortions under Medicaid, impinges on the "liberty" protected by the Due Process Clause as recognized in *Roe* v. *Wade*, 410 U. S. 113, and its progeny.

In the *Wade* case, this Court held unconstitutional a Texas statute making it a crime to procure or attempt an abortion except on medical advice for the purpose of saving the mother's life. The constitutional underpinning of *Wade* was a recognition that the "liberty" protected by the Due Process Clause of the Fourteenth Amendment includes not only the freedoms explicitly mentioned in the Bill of Rights, but also a freedom of personal choice in certain matters of marriage and family life.[18] This implicit constitutional liberty, the Court in *Wade* held, includes the freedom of a woman to decide whether to terminate a pregnancy.

---

sufficiently understand and comply with, without sacrifice to the public interest." *Broadrick* v. *Oklahoma*, 413 U. S. 601, 608.

[18] The Court in *Wade* observed that previous decisions of this Court had recognized that the liberty protected by the Due Process Clause "has some extension to activities relating to marriage, *Loving* v. *Virginia*, 388 U. S. 1, 12 (1967); procreation, *Skinner* v. *Oklahoma*, 316 U. S. 535, 541–542 (1942); contraception, *Eisenstadt* v. *Baird*, 405 U. S [438,] 453–454; *id.*, at 460, 463–465 (WHITE, J., concurring in result); family relationships, *Prince* v. *Massachusetts*, 321 U. S. 158, 166 (1944); and child rearing and education, *Pierce* v. *Society of Sisters*, 268 U. S. 510, 535 (1925); *Meyer* v. *Nebraska*, [262 U. S. 390, 399 (1923)]." 410 U. S., at 152–153.

But the Court in *Wade* also recognized that a State has legitimate interests during a pregnancy in both ensuring the health of the mother and protecting potential human life. These state interests, which were found to be "separate and distinct" and to "gro[w] in substantiality as the woman approaches term," *id.*, at 162–163, pose a conflict with a woman's untrammeled freedom of choice. In resolving this conflict, the Court held that before the end of the first trimester of pregnancy, neither state interest is sufficiently substantial to justify any instrusion on the woman's freedom of choice. In the second trimester, the state interest in maternal health was found to be sufficiently substantial to justify regulation reasonably related to that concern. And at viability, usually in the third trimester, the state interest in protecting the potential life of the fetus was found to justify a criminal prohibition against abortions, except where necessary for the preservation of the life or health of the mother. Thus, inasmuch as the Texas criminal statute allowed abortions only where necessary to save the life of the mother and without regard to the stage of the pregnancy, the Court held in *Wade* that the statute violated the Due Process Clause of the Fourteenth Amendment.

In *Maher* v. *Roe*, 432 U. S. 464, the Court was presented with the question whether the scope of personal constitutional freedom recognized in *Roe* v. *Wade* included an entitlement to Medicaid payments for abortions that are not medically necessary. At issue in *Maher* was a Connecticut welfare regulation under which Medicaid recipients received payments for medical services incident to childbirth, but not for medical services incident to nontherapeutic abortions. The District Court held that the regulation violated the Equal Protection Clause of the Fourteenth Amendment because the unequal subsidization of childbirth and abortion impinged on the "fundamental right to abortion" recognized in *Wade* and its progeny.

It was the view of this Court that "the District Court misconceived the nature and scope of the fundamental right recognized in *Roe.*" 432 U. S., at 471. The doctrine of *Roe* v. *Wade,* the Court held in *Maher,* "protects the woman from unduly burdensome interference with her freedom to decide whether to terminate her pregnancy," *id.,* at 473–474, such as the severe criminal sanctions at issue in *Roe* v. *Wade, supra,* or the absolute requirement of spousal consent for an abortion challenged in *Planned Parenthood of Central Missouri* v. *Danforth,* 428 U. S. 52.

But the constitutional freedom recognized in *Wade* and its progeny, the *Maher* Court explained, did not prevent Connecticut from making "a value judgment favoring childbirth over abortion, and . . . implement[ing] that judgment by the allocation of public funds." 432 U. S., at 474. As the Court elaborated:

> "The Connecticut regulation before us is different in kind from the laws invalidated in our previous abortion decisions. The Connecticut regulation places no obstacles—absolute or otherwise—in the pregnant woman's path to an abortion. An indigent woman who desires an abortion suffers no disadvantage as a consequence of Connecticut's decision to fund childbirth; she continues as before to be dependent on private sources for the service she desires. The State may have made childbirth a more attractive alternative, thereby influencing the woman's decision, but it has imposed no restriction on access to abortions that was not already there. The indigency that may make it difficult—and in some cases, perhaps, impossible—for some women to have abortions is neither created nor in any way affected by the Connecticut regulation." *Ibid.*

The Court in *Maher* noted that its description of the doctrine recognized in *Wade* and its progeny signaled "no retreat" from those decisions. In explaining why the con-

stitutional principle recognized in *Wade* and later cases—protecting a woman's freedom of choice—did not translate into a constitutional obligation of Connecticut to subsidize abortions, the Court cited the "basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy. Constitutional concerns are greatest when the State attempts to impose its will by force of law; the State's power to encourage actions deemed to be in the public interest is necessarily far broader." 432 U. S., at 475–476 (footnote omitted). Thus, even though the Connecticut regulation favored childbirth over abortion by means of subsidization of one and not the other, the Court in *Maher* concluded that the regulation did not impinge on the constitutional freedom recognized in *Wade* because it imposed no governmental restriction on access to abortions.

The Hyde Amendment, like the Connecticut welfare regulation at issue in *Maher,* places no governmental obstacle in the path of a woman who chooses to terminate her pregnancy, but rather, by means of unequal subsidization of abortion and other medical services, encourages alternative activity deemed in the public interest. The present case does differ factually from *Maher* insofar as that case involved a failure to fund nontherapeutic abortions, whereas the Hyde Amendment withholds funding of certain medically necessary abortions. Accordingly, the appellees argue that because the Hyde Amendment affects a significant interest not present or asserted in *Maher*—the interest of a woman in protecting her health during pregnancy—and because that interest lies at the core of the personal constitutional freedom recognized in *Wade,* the present case is constitutionally different from *Maher.* It is the appellees' view that to the extent that the Hyde Amendment withholds funding for certain medically necessary abortions, it clearly impinges on the constitutional principle recognized in *Wade.*

It is evident that a woman's interest in protecting her health was an important theme in *Wade*. In concluding that the freedom of a woman to decide whether to terminate her pregnancy falls within the personal liberty protected by the Due Process Clause, the Court in *Wade* emphasized the fact that the woman's decision carries with it significant personal health implications—both physical and psychological. 410 U. S., at 153. In fact, although the Court in *Wade* recognized that the state interest in protecting potential life becomes sufficiently compelling in the period after fetal viability to justify an absolute criminal prohibition of nontherapeutic abortions, the Court held that even after fetal viability a State may not prohibit abortions "necessary to preserve the life or health of the mother." *Id.*, at 164. Because even the compelling interest of the State in protecting potential life after fetal viability was held to be insufficient to outweigh a woman's decision to protect her life or health, it could be argued that the freedom of a woman to decide whether to terminate her pregnancy for health reasons does in fact lie at the core of the constitutional liberty identified in *Wade*.

But, regardless of whether the freedom of a woman to choose to terminate her pregnancy for health reasons lies at the core or the periphery of the due process liberty recognized in *Wade*, it simply does not follow that a woman's freedom of choice carries with it a constitutional entitlement to the financial resources to avail herself of the full range of protected choices. The reason why was explained in *Maher*: although government may not place obstacles in the path of a woman's exercise of her freedom of choice, it need not remove those not of its own creation. Indigency falls in the latter category. The financial constraints that restrict an indigent woman's ability to enjoy the full range of constitutionally protected freedom of choice are the product not of governmental restrictions on access to abortions, but rather of her indigency. Although Congress has opted to subsidize

medically necessary services generally, but not certain med-
ically necessary abortions, the fact remains that the Hyde
Amendment leaves an indigent woman with at least the same
range of choice in deciding whether to obtain a medically
necessary abortion as she would have had if Congress had
chosen to subsidize no health care costs at all. We are thus
not persuaded that the Hyde Amendment impinges on the
constitutionally protected freedom of choice recognized in
*Wade*.[19]

Although the liberty protected by the Due Process Clause
affords protection against unwarranted government interfer-
ence with freedom of choice in the context of certain personal

---

[19] The appellees argue that the Hyde Amendment is unconstitutional
because it "penalizes" the exercise of a woman's choice to terminate a
pregnancy by abortion. See *Memorial Hospital* v. *Maricopa County,* 415
U. S. 250; *Shapiro* v. *Thompson,* 394 U. S. 618. This argument falls
short of the mark. In *Maher,* the Court found only a "semantic differ-
ence" between the argument that Connecticut's refusal to subsidize non-
therapeutic abortions "unduly interfere[d]" with the exercise of the consti-
tutional liberty recognized in *Wade* and the argument that it "penalized"
the exercise of that liberty. 432 U. S., at 474, n. 8. And, regardless of how
the claim was characterized, the *Maher* Court rejected the argument that
Connecticut's refusal to subsidize protected conduct, without more, im-
pinged on the constitutional freedom of choice. This reasoning is equally
applicable in the present case. A substantial constitutional question would
arise if Congress had attempted to withhold all Medicaid benefits from an
otherwise eligible candidate simply because that candidate had exercised
her constitutionally protected freedom to terminate her pregnancy by
abortion. This would be analogous to *Sherbert* v. *Verner,* 374 U. S. 398,
where this Court held that a State may not, consistent with the First and
Fourteenth Amendments, withhold *all* unemployment compensation benefits
from a claimant who would otherwise be eligible for such benefits but for
the fact that she is unwilling to work one day per week on her Sabbath.
But the Hyde Amendment, unlike the statute at issue in *Sherbert,* does not
provide for such a broad disqualification from receipt of public benefits.
Rather, the Hyde Amendment, like the Connecticut welfare provision at
issue in *Maher,* represents simply a refusal to subsidize certain protected
conduct. A refusal to fund protected activity, without more, cannot be
equated with the imposition of a "penalty" on that activity.

decisions, it does not confer an entitlement to such funds as may be necessary to realize all the advantages of that freedom.  To hold otherwise would mark a drastic change in our understanding of the Constitution.  It cannot be that because government may not prohibit the use of contraceptives, *Griswold* v. *Connecticut,* 381 U. S. 479, or prevent parents from sending their child to a private school, *Pierce* v. *Society of Sisters,* 268 U. S. 510, government, therefore, has an affirmative constitutional obligation to ensure that all persons have the financial resources to obtain contraceptives or send their children to private schools.  To translate the limitation on governmental power implicit in the Due Process Clause into an affirmative funding obligation would require Congress to subsidize the medically necessary abortion of an indigent woman even if Congress had not enacted a Medicaid program to subsidize other medically necessary services.  Nothing in the Due Process Clause supports such an extraordinary result.[20]  Whether freedom of choice that is constitutionally protected warrants federal subsidization is a question for Congress to answer, not a matter of constitutional entitlement. Accordingly, we conclude that the Hyde Amendment does not impinge on the due process liberty recognized in *Wade.*[21]

## B

The appellees also argue that the Hyde Amendment contravenes rights secured by the Religion Clauses of the First

---

[20] As this Court in *Maher* observed: "The Constitution imposes no obligation on the [government] to pay the pregnancy-related medical expenses of indigent women, or indeed to pay any of the medical expenses of indigents."  432 U. S., at 469.

[21] Since the constitutional entitlement of a physician who administers medical care to an indigent woman is no broader than that of his patient, see *Whalen* v. *Roe,* 429 U. S. 589, 604, and n. 33, we also reject the appellees' claim that the funding restrictions of the Hyde Amendment violate the due process rights of the physician who advises a Medicaid recipient to obtain a medically necessary abortion.

Amendment. It is the appellees' view that the Hyde Amendment violates the Establishment Clause because it incorporates into law the doctrines of the Roman Catholic Church concerning the sinfulness of abortion and the time at which life commences. Moreover, insofar as a woman's decision to seek a medically necessary abortion may be a product of her religious beliefs under certain Protestant and Jewish tenets, the appellees assert that the funding limitations of the Hyde Amendment impinge on the freedom of religion guaranteed by the Free Exercise Clause.

**1**

It is well settled that "a legislative enactment does not contravene the Establishment Clause if it has a secular legislative purpose, if its principal or primary effect neither advances nor inhibits religion, and if it does not foster an excessive governmental entanglement with religion." *Committee for Public Education* v. *Regan,* 444 U. S. 646, 653. Applying this standard, the District Court properly concluded that the Hyde Amendment does not run afoul of the Establishment Clause. Although neither a State nor the Federal Government can constitutionally "pass laws which aid one religion, aid all religions, or prefer one religion over another," *Everson* v. *Board of Education,* 330 U. S. 1, 15, it does not follow that a statute violates the Establishment Clause because it "happens to coincide or harmonize with the tenets of some or all religions." *McGowan* v. *Maryland,* 366 U. S. 420, 442. That the Judaeo-Christian religions oppose stealing does not mean that a State or the Federal Government may not, consistent with the Establishment Clause, enact laws prohibiting larceny. *Ibid.* The Hyde Amendment, as the District Court noted, is as much a reflection of "traditionalist" values towards abortion, as it is an embodiment of the views of any particular religion. 491 F. Supp., at 741. See also *Roe* v. *Wade,* 410 U. S., at 138–141. In sum, we are convinced that the fact that the funding restrictions in the

Hyde Amendment may coincide with the religious tenets of the Roman Catholic Church does not, without more, contravene the Establishment Clause.

### 2

We need not address the merits of the appellees' arguments concerning the Free Exercise Clause, because the appellees lack standing to raise a free exercise challenge to the Hyde Amendment. The named appellees fall into three categories: (1) the indigent pregnant women who sued on behalf of other women similarly situated, (2) the two officers of the Women's Division, and (3) the Women's Division itself.[22] The named appellees in the first category lack standing to challenge the Hyde Amendment on free exercise grounds because none alleged, much less proved, that she sought an abortion under compulsion of religious belief.[23] See *McGowan* v. *Maryland, supra,* at 429. Although the named appellees in the second category did provide a detailed description of their religious beliefs, they failed to allege either that they are or expect to be pregnant or that they are eligible to receive Medicaid. These named appellees, therefore, lack the personal stake in the controversy needed to confer standing to raise such a challenge to the Hyde Amendment. See *Warth* v. *Seldin,* 422 U. S. 490, 498–499.

Finally, although the Women's Division alleged that its

---

[22] The remaining named appellees, including the individual physicians and the New York City Health and Hospitals Corp., did not attack the Hyde Amendment on the basis of the Free Exercise Clause of the First Amendment.

[23] These named appellees sued on behalf of the class of "women of all religious and nonreligious persuasions and beliefs who have, in accordance with the teaching of their religion and/or the dictates of their conscience determined that an abortion is necessary." But since we conclude below that the named appellees have not established their own standing to sue, "[t]hey cannot represent a class of whom they are not a part." *Bailey* v. *Patterson,* 369 U. S. 31, 32–33. See also *O'Shea* v. *Littleton,* 414 U. S. 488, 494–495.

membership includes "pregnant Medicaid eligible women who, as a matter of religious practice and in accordance with their conscientious beliefs, would choose but are precluded or discouraged from obtaining abortions reimbursed by Medicaid because of the Hyde Amendment," the Women's Division does not satisfy the standing requirements for an organization to assert the rights of its membership. One of those requirements is that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt* v. *Washington Apple Advertising Comm'n,* 432 U. S. 333, 343. Since "it is necessary in a free exercise case for one to show the coercive effect of the enactment as it operates against him in the practice of his religion," *Abington School Dist.* v. *Schempp,* 374 U. S. 203, 223, the claim asserted here is one that ordinarily requires individual participation.[24] In the present case, the Women's Division concedes that "the permissibility, advisability and/or necessity of abortion according to circumstance is a matter about which there is diversity of view within . . . our membership, and is a determination which must be ultimately and absolutely entrusted to the conscience of the individual before God." It is thus clear that the participation of individual members of the Women's Division is essential to a proper understanding and resolution of their free exercise claims. Accordingly, we conclude that the Women's Division, along with the other named appellees, lack standing to challenge the Hyde Amendment under the Free Exercise Clause.

## C

It remains to be determined whether the Hyde Amendment violates the equal protection component of the Fifth Amendment. This challenge is premised on the fact that, although

---

[24] For example, in *Board of Education* v. *Allen,* 392 U. S. 236, 249, the Court found no free exercise violation since the plaintiffs had "not contended that the [statute in question] in any way coerce[d] them *as individuals* in the practice of their religion." (Emphasis added.)

federal reimbursement is available under Medicaid for medically necessary services generally, the Hyde Amendment does not permit federal reimbursement of all medically necessary abortions. The District Court held, and the appellees argue here, that this selective subsidization violates the constitutional guarantee of equal protection.

The guarantee of equal protection under the Fifth Amendment is not a source of substantive rights or liberties,[25] but rather a right to be free from invidious discrimination in statutory classifications and other governmental activity. It is well settled that where a statutory classification does not itself impinge on a right or liberty protected by the Constitution, the validity of classification must be sustained unless "the classification rests on grounds wholly irrelevant to the achievement of [any legitimate governmental] objective." *McGowan* v. *Maryland,* 366 U. S., at 425. This presumption of constitutional validity, however, disappears if a statutory classification is predicated on criteria that are, in a constitutional sense, "suspect," the principal example of which is a classification based on race, *e. g., Brown* v. *Board of Education,* 347 U. S. 483.

1

For the reasons stated above, we have already concluded that the Hyde Amendment violates no constitutionally protected substantive rights. We now conclude as well that it is not predicated on a constitutionally suspect classification. In reaching this conclusion, we again draw guidance from the Court's decision in *Maher* v. *Roe.* As to whether the Con-

---

[25] An exception to this statement is to be found in *Reynolds* v. *Sims,* 377 U. S. 533, and its progeny. Although the Constitution of the United States does not confer the right to vote in state elections, see *Minor* v. *Happersett,* 21 Wall. 162, 178, *Reynolds* held that if a State adopts an electoral system, the Equal Protection Clause of the Fourteenth Amendment confers upon a qualified voter a substantive right to participate in the electoral process equally with other qualified voters. See, *e. g., Dunn* v. *Blumstein,* 405 U. S. 330, 336.

necticut welfare regulation providing funds for childbirth but not for nontherapeutic abortions discriminated against a suspect class, the Court in *Maher* observed:

> "An indigent woman desiring. an abortion does not come within the limited category of disadvantaged classes so recognized by our cases. Nor does the fact that the impact of the regulation falls upon those who cannot pay lead to a different conclusion. In a sense, every denial of welfare to an indigent creates a wealth classification as compared to nonindigents who are able to pay for the desired goods or services. But this Court has never held that financial need alone identifies a suspect class for purposes of equal protection analysis." 432 U. S., at 470–471, citing *San Antonio Independent School Dist.* v. *Rodriguez,* 411 U. S. 1, 29; *Dandridge* v. *Williams,* 397 U. S. 471.

Thus, the Court in *Maher* found no basis for concluding that the Connecticut regulation was predicated on a suspect classification.

It is our view that the present case is indistinguishable from *Maher* in this respect. Here, as in *Maher,* the principal impact of the Hyde Amendment falls on the indigent. But that fact does not itself render the funding restriction constitutionally invalid, for this Court has held repeatedly that poverty, standing alone, is not a suspect classification. See, *e. g., James* v. *Valtierra,* 402 U. S. 137. That *Maher* involved the refusal to fund nontherapeutic abortions, whereas the present case involves the refusal to fund medically necessary abortions, has no bearing on the factors that render a classification "suspect" within the meaning of the constitutional guarantee of equal protection.[26]

---

[26] Although the matter is not free from doubt, the District Court seems to have concluded that teenage women desiring medically necessary abortions constitute a "suspect class" for purposes of triggering a heightened level of equal protection scrutiny. In this regard, the District Court observed that the Hyde Amendment "clearly operate[s] to the disadvan-

## 2

The remaining question then is whether the Hyde Amendment is rationally related to a legitimate governmental objective. It is the Government's position that the Hyde Amendment bears a rational relationship to its legitimate interest in protecting the potential life of the fetus. We agree.

In *Wade,* the Court recognized that the State has an "important and legitimate interest in protecting the potentiality of human life." 410 U. S., at 162. That interest was found to exist throughout a pregnancy, "grow[ing] in substantiality as the woman approaches term." *Id.,* at 162–163. See also *Beal* v. *Doe,* 432 U. S., at 445–446. Moreover, in *Maher,* the Court held that Connecticut's decision to fund the costs associated with childbirth but not those associated with nontherapeutic abortions was a rational means of advancing the legitimate state interest in protecting potential life by

---

tage of one suspect class, that is to the disadvantage of the statutory class of adolescents at a high risk of pregnancy . . . , and particularly those seventeen and under." 491 F. Supp., at 738. The "statutory" class to which the District Court was referring is derived from the Adolescent Health Services and Pregnancy Prevention and Care Act, 42 U. S. C. § 300a–21 *et seq.* (1976 ed., Supp. II). It was apparently the view of the District Court that since statistics indicate that women under 21 years of age are disproportionately represented among those for whom an abortion is medically necessary, the Hyde Amendment invidiously discriminates against teenage women.

But the Hyde Amendment is facially neutral as to age, restricting funding for abortions for women of all ages. The District Court erred, therefore, in relying solely on the disparate impact of the Hyde Amendment in concluding that it discriminated on the basis of age. The equal protection component of the Fifth Amendment prohibits only purposeful discrimination, *Washington* v. *Davis,* 426 U. S. 229, and when a facially neutral federal statute is challenged on equal protection grounds, it is incumbent upon the challenger to prove that Congress "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Administrator of Mass.* v. *Feeney,* 442 U. S. 256, 279. There is no evidence to support such a finding of intent in the present case.

encouraging childbirth. 432 U. S., at 478–479. See also *Poelker* v. *Doe*, 432 U. S. 519, 520–521.

It follows that the Hyde Amendment, by encouraging childbirth except in the most urgent circumstances, is rationally related to the legitimate governmental objective of protecting potential life. By subsidizing the medical expenses of indigent women who carry their pregnancies to term while not subsidizing the comparable expenses of women who undergo abortions (except those whose lives are threatened),[27] Congress has established incentives that make childbirth a more attractive alternative than abortion for persons eligible for Medicaid. These incentives bear a direct relationship to the legitimate congressional interest in protecting potential life. Nor is it irrational that Congress has authorized federal reimbursement for medically necessary services generally, but not for certain medically necessary abortions.[28] Abortion is inherently different from other medical procedures, because no other procedure involves the purposeful termination of a potential life.

After conducting an extensive evidentiary hearing into issues surrounding the public funding of abortions, the District Court concluded that "[t]he interests of . . . the federal government . . . in the fetus and in preserving it are not sufficient, weighed in the balance with the woman's threatened health, to justify withdrawing medical assistance unless the

---

[27] We address here the constitutionality of the most restrictive version of the Hyde Amendment, namely, that applicable in fiscal year 1976 under which federal funds were unavailable for abortions "except where the life of the mother would be endangered if the fetus were carried to term." Three versions of the Hyde Amendment are at issue in this case. If the most restrictive version is constitutionally valid, so too are the others.

[28] In fact, abortion is not the only "medically necessary" service for which federal funds under Medicaid are sometimes unavailable to otherwise eligible claimants. See 42 U. S. C. § 1396d (a) (17) (B) (inpatient hospital care of patients between 21 and 65 in institutions for tuberculosis or mental disease not covered by Title XIX).

woman consents . . . to carry the fetus to term." 491 F. Supp., at 737. In making an independent appraisal of the competing interests involved here, the District Court went beyond the judicial function. Such decisions are entrusted under the Constitution to Congress, not the courts. It is the role of the courts only to ensure that congressional decisions comport with the Constitution.

Where, as here, the Congress has neither invaded a substantive constitutional right or freedom, nor enacted legislation that purposefully operates to the detriment of a suspect class, the only requirement of equal protection is that congressional action be rationally related to a legitimate governmental interest. The Hyde Amendment satisfies that standard. It is not the mission of this Court or any other to decide whether the balance of competing interests reflected in the Hyde Amendment is wise social policy. If that were our mission, not every Justice who has subscribed to the judgment of the Court today could have done so. But we cannot, in the name of the Constitution, overturn duly enacted statutes simply "because they may be unwise, improvident, or out of harmony with a particular school of thought." *Williamson* v. *Lee Optical Co.*, 348 U. S. 483, 488, quoted in *Dandridge* v. *Williams*, 397 U. S., at 484. Rather, "when an issue involves policy choices as sensitive as those implicated [here] . . . , the appropriate forum for their resolution in a democracy is the legislature." *Maher* v. *Roe, supra,* at 479.

## IV

For the reasons stated in this opinion, we hold that a State that participates in the Medicaid program is not obligated under Title XIX to continue to fund those medically necessary abortions for which federal reimbursement is unavailable under the Hyde Amendment. We further hold that the funding restrictions of the Hyde Amendment violate neither the Fifth Amendment nor the Establishment Clause of the First Amendment. It is also our view that the appellees

lack standing to raise a challenge to the Hyde Amendment under the Free Exercise Clause of the First Amendment. Accordingly, the judgment of the District Court is reversed, and the case is remanded to that court for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE WHITE, concurring.

I join the Court's opinion and judgment with these additional remarks.

*Roe* v. *Wade,* 410 U. S. 113 (1973), held that prior to viability of the fetus, the governmental interest in potential life was insufficient to justify overriding the due process right of a pregnant woman to terminate her pregnancy by abortion. In the last trimester, however, the State's interest in fetal life was deemed sufficiently strong to warrant a ban on abortions, but only if continuing the pregnancy did not threaten the life or health of the mother. In the latter event, the State was required to respect the choice of the mother to terminate the pregnancy and protect her health.

Drawing upon *Roe* v. *Wade* and the cases that followed it, MR. JUSTICE STEVENS' dissent extrapolates the general proposition that the governmental interest in potential life may in no event be pursued at the expense of the mother's health. It then notes that under the Hyde Amendment, Medicaid refuses to fund abortions where carrying to term threatens maternal health but finances other medically indicated procedures, including childbirth. The dissent submits that the Hyde Amendment therefore fails the first requirement imposed by the Fifth Amendment and recognized by the Court's opinion today—that the challenged official action must serve a legitimate governmental goal, *ante,* at 324.

The argument has a certain internal logic, but it is not legally sound. The constitutional right recognized in *Roe* v. *Wade* was the right to choose to undergo an abortion without coercive interference by the government. As the Court

points out, *Roe* v. *Wade* did not purport to adjudicate a right to have abortions funded by the government, but only to be free from unreasonable official interference with private choice. At an appropriate stage in a pregnancy, for example, abortions could be prohibited to implement the governmental interest in potential life, but in no case to the damage of the health of the mother, whose choice to suffer an abortion rather than risk her health the government was forced to respect.

*Roe* v. *Wade* thus dealt with the circumstances in which the governmental interest in potential life would justify official interference with the abortion choices of pregnant women. There is no such calculus involved here. The Government does not seek to interfere with or to impose any coercive restraint on the choice of any woman to have an abortion. The woman's choice remains unfettered, the Government is not attempting to use its interest in life to justify a coercive restraint, and hence in disbursing its Medicaid funds it is free to implement rationally what *Roe* v. *Wade* recognized to be its legitimate interest in a potential life by covering the medical costs of childbirth but denying funds for abortions. Neither *Roe* v. *Wade* nor any of the cases decided in its wake invalidates this legislative preference. We decided as much in *Maher* v. *Roe*, 432 U. S. 464 (1977), when we rejected the claims that refusing funds for non-therapeutic abortions while defraying the medical costs of childbirth, although not an outright prohibition, nevertheless infringed the fundamental right to choose to terminate a pregnancy by abortion and also violated the equal protection component of the Fifth Amendment. I would not abandon *Maher* and extend *Roe* v. *Wade* to forbid the legislative policy expressed in the Hyde Amendment.

Nor can *Maher* be successfully distinguished on the ground that it involved only nontherapeutic abortions that the Government was free to place outside the ambit of its Medicaid program. That is not the ground on which *Maher* pro-

ceeded. *Maher* held that the government need not fund elective abortions because withholding funds rationally furthered the State's legitimate interest in normal childbirth. We sustained this policy even though under *Roe* v. *Wade,* the government's interest in fetal life is an inadequate justification for coercive interference with the pregnant woman's right to choose an abortion, whether or not such a procedure is medically indicated. We have already held, therefore, that the interest balancing involved in *Roe* v. *Wade* is not controlling in resolving the present constitutional issue. Accordingly, I am satisfied that the straightforward analysis followed in MR. JUSTICE STEWART's opinion for the Court is sound.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE MARSHALL and MR. JUSTICE BLACKMUN join, dissenting.*

I agree entirely with my Brother STEVENS that the State's interest in protecting the potential life of the fetus cannot justify the exclusion of financially and medically needy women from the benefits to which they would otherwise be entitled solely because the treatment that a doctor has concluded is medically necessary involves an abortion. See *post,* at 351–352. I write separately to express my continuing disagreement [1] with the Court's mischaracterization of the nature of the fundamental right recognized in *Roe* v. *Wade,* 410 U. S. 113 (1973), and its misconception of the manner in which that right is infringed by federal and state legislation withdrawing all funding for medically necessary abortions.

*Roe* v. *Wade* held that the constitutional right to personal privacy encompasses a woman's decision whether or not to

---

*[This opinion applies also to No. 79–4, *Williams et al.* v. *Zbaraz et al.,* No. 79–5, *Miller, Acting Director, Illinois Department of Public Aid, et al.* v. *Zbaraz et al.,* and No. 79–491, *United States* v. *Zbaraz et al., post,* p. 358.]

[1] See *Maher* v. *Roe,* 432 U. S. 464, 482–490 (1977) (BRENNAN, J., dissenting).

terminate her pregnancy. *Roe* and its progeny [2] established that the pregnant woman has a right to be free from state interference with her choice to have an abortion—a right which, at least prior to the end of the first trimester, absolutely prohibits any governmental regulation of that highly personal decision.[3] The proposition for which these cases stand thus is not that the State is under an affirmative obligation to ensure access to abortions for all who may desire them; it is that the State must refrain from wielding its enormous power and influence in a manner that might burden the pregnant woman's freedom to choose whether to have an abortion. The Hyde Amendment's denial of public funds for medically necessary abortions plainly intrudes upon this constitutionally protected decision, for both by design and in effect it serves to coerce indigent pregnant women to bear children that they would otherwise elect not to have.[4]

---

[2] *E. g., Doe* v. *Bolton,* 410 U. S. 179 (1973); *Planned Parenthood of Central Missouri* v. *Danforth,* 428 U. S. 52 (1976); *Singleton* v. *Wulff,* 428 U. S. 106 (1976); *Bellotti* v. *Baird,* 443 U. S. 622 (1979); cf. *Carey* v. *Population Services International,* 431 U. S. 678 (1977).

[3] After the first trimester, the State, in promoting its interest in the mother's health, may regulate the abortion *procedure* in ways that are reasonably related to that end. And even after the point of viability is reached, state regulation in furtherance of its interest in the potentiality of human life may not go so far as to proscribe abortions that are necessary to preserve the life or health of the mother. See *Roe* v. *Wade,* 410 U. S. 113, 164–165 (1973).

[4] My focus throughout this opinion is upon the coercive impact of the congressional decision to fund one outcome of pregnancy—childbirth—while not funding the other—abortion. Because I believe this alone renders the Hyde Amendment unconstitutional, I do not dwell upon the other disparities that the Amendment produces in the treatment of rich and poor, pregnant and nonpregnant. I concur completely, however, in my Brother STEVENS' discussion of those disparities. Specifically, I agree that the congressional decision to fund all medically necessary procedures except for those that require an abortion is entirely irrational either as a means of allocating health-care resources or otherwise serving legitimate social welfare goals. And that irrationality in turn exposes the Amend-

When viewed in the context of the Medicaid program to which it is appended, it is obvious that the Hyde Amendment is nothing less than an attempt by Congress to circumvent the dictates of the Constitution and achieve indirectly what *Roe* v. *Wade* said it could not do directly.[5] Under Title XIX of the Social Security Act, the Federal Government reimburses participating States for virtually all medically necessary services it provides to the categorically needy. The sole limitation of any significance is the Hyde Amendment's prohibition against the use of any federal funds to pay for the

---

ment for what it really is—a deliberate effort to discourage the exercise of a constitutionally protected right.

It is important to put this congressional decision in human terms. Nonpregnant women may be reimbursed for all medically necessary treatments. Pregnant women with analogous ailments, however, will be reimbursed only if the treatment involved does not happen to include an abortion. Since the refusal to fund will in some significant number of cases force the patient to forgo medical assistance, the result is to refuse treatment for some genuine maladies not because they need not be treated, cannot be treated, or are too expensive to treat, and not because they relate to a deliberate choice to abort a pregnancy, but merely because treating them would as a practical matter require termination of that pregnancy. Even were one of the view that legislative hostility to abortions could justify a decision to fund obstetrics and child delivery services while refusing to fund nontherapeutic abortions, the present statutory scheme could not be saved. For here, that hostility has gone a good deal farther. Its consequence is to leave indigent sick women without treatment simply because of the medical fortuity that their illness cannot be treated unless their pregnancy is terminated. Antipathy to abortion, in short, has been permitted not only to ride roughshod over a woman's constitutional right to terminate her pregnancy in the fashion she chooses, but also to distort our Nation's health-care programs. As a means of delivering health services, then, the Hyde Amendment is completely irrational. As a means of preventing abortions, it is concededly rational—brutally so. But this latter goal is constitutionally forbidden.

[5] Cf. *Singleton* v. *Wulff, supra,* at 118–119, n. 7:

"For a doctor who cannot afford to work for nothing, and a woman who cannot afford to pay him, the State's refusal to fund an abortion is as effective an 'interdiction' of it as would ever be necessary."

costs of abortions (except where the life of the mother would be endangered if the fetus were carried to term). As my Brother STEVENS persuasively demonstrates, exclusion of medically necessary abortions from Medicaid coverage cannot be justified as a cost-saving device. Rather, the Hyde Amendment is a transparent attempt by the Legislative Branch to impose the political majority's judgment of the morally acceptable and socially desirable preference on a sensitive and intimate decision that the Constitution entrusts to the individual. Worse yet, the Hyde Amendment does not foist that majoritarian viewpoint with equal measure upon everyone in our Nation, rich and poor alike; rather, it imposes that viewpoint only upon that segment of our society which, because of its position of political powerlessness, is least able to defend its privacy rights from the encroachments of state-mandated morality. The instant legislation thus calls for more exacting judicial review than in most other cases. "When elected leaders cower before public pressure, this Court, more than ever, must not shirk its duty to enforce the Constitution for the benefit of the poor and powerless." *Beal* v. *Doe,* 432 U. S. 438, 462 (1977) (MARSHALL, J., dissenting). Though it may not be this Court's mission "to decide whether the balance of competing interests reflected in the Hyde Amendment is wise social policy," *ante,* at 326, it most assuredly is our responsibility to vindicate the pregnant woman's constitutional right to decide whether to bear children free from governmental intrusion.

Moreover, it is clear that the Hyde Amendment not only was designed to inhibit, but does in fact inhibit the woman's freedom to choose abortion over childbirth. "Pregnancy is unquestionably a condition requiring medical services. . . . Treatment for the condition may involve medical procedures for its termination, or medical procedures to bring the pregnancy to term, resulting in a live birth. '[A]bortion and childbirth, when stripped of the sensitive moral arguments surrounding the abortion controversy, are simply two alter-

native medical methods of dealing with pregnancy. . . .' "
*Beal* v. *Doe, supra,* at 449 (BRENNAN, J., dissenting) (quoting
*Roe* v. *Norton,* 408 F. Supp. 660, 663, n. 3 (Conn. 1975)).  In
every pregnancy, one of these two courses of treatment is
medically necessary, and the poverty-stricken woman depends
on the Medicaid Act to pay for the expenses associated
with that procedure.  But under the Hyde Amendment, the
Government will fund only those procedures incidental to
childbirth.  By thus injecting coercive financial incentives
favoring childbirth into a decision that is constitutionally
guaranteed to be free from governmental intrusion, the Hyde
Amendment deprives the indigent woman of her freedom to
choose abortion over maternity, thereby impinging on the due
process liberty right recognized in *Roe* v. *Wade.*

The Court's contrary conclusion is premised on its belief
that "[t]he financial constraints that restrict an indigent
woman's ability to enjoy the full range of constitutionally
protected freedom of choice are the product not of govern-
mental restrictions on access to abortions, but rather of her
indigency."  *Ante,* at 316.  Accurate as this statement may
be, it reveals only half the picture.  For what the Court fails
to appreciate is that it is not simply the woman's indigency
that interferes with her freedom of choice, but the combina-
tion of her own poverty and the Government's unequal sub-
sidization of abortion and childbirth.

A poor woman in the early stages of pregnancy confronts
two alternatives: she may elect either to carry the fetus to
term or to have an abortion.  In the abstract, of course, this
choice is hers alone, and the Court rightly observes that the
Hyde Amendment "places no governmental obstacle in the
path of a woman who chooses to terminate her pregnancy."
*Ante,* at 315.  But the reality of the situation is that the
Hyde Amendment has effectively removed this choice from
the indigent woman's hands.  By funding all of the expenses
associated with childbirth and none of the expenses incurred
in terminating pregnancy, the Government literally makes an

offer that the indigent woman cannot afford to refuse. It matters not that in this instance the Government has used the carrot rather than the stick. What is critical is the realization that as a practical matter, many poverty-stricken women will choose to carry their pregnancy to term simply because the Government provides funds for the associated medical services, even though these same women would have chosen to have an abortion if the Government had also paid for that option, or indeed if the Government had stayed out of the picture altogether and had defrayed the costs of neither procedure.

The fundamental flaw in the Court's due process analysis, then, is its failure to acknowledge that the discriminatory distribution of the benefits of governmental largesse can discourage the exercise of fundamental liberties just as effectively as can an outright denial of those rights through criminal and regulatory sanctions. Implicit in the Court's reasoning is the notion that as long as the Government is not obligated to provide its citizens with certain benefits or privileges, it may condition the grant of such benefits on the recipient's relinquishment of his constitutional rights.

It would belabor the obvious to expound at any great length on the illegitimacy of a state policy that interferes with the exercise of fundamental rights through the selective bestowal of governmental favors. It suffices to note that we have heretofore never hesitated to invalidate any scheme of granting or withholding financial benefits that incidentally or intentionally burdens one manner of exercising a constitutionally protected choice. To take but one example of many, *Sherbert* v. *Verner*, 374 U. S. 398 (1963), involved a South Carolina unemployment insurance statute that required recipients to accept suitable employment when offered, even if the grounds for refusal stemmed from religious convictions. Even though the recipients possessed no entitlement to compensation, the Court held that the State could not cancel the

benefits of a Seventh-Day Adventist who had refused a job requiring her to work on Saturdays. The Court's explanation is particularly instructive for the present case:

"Here not only is it apparent that appellant's declared ineligibility for benefits derives solely from the practice of her religion, but the pressure upon her to forego that practice is unmistakable. The ruling forces her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand. Governmental imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine imposed against appellant for her Saturday worship.

"Nor may the South Carolina court's construction of the statute be saved from constitutional infirmity on the ground that unemployment compensation benefits are not appellant's 'right' but merely a 'privilege.' It is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege. . . . [T]o condition the availability of benefits upon this appellant's willingness to violate a cardinal principle of her religious faith effectively penalizes the free exercise of her constitutional liberties." *Id.*, at 404–406.

See also *Frost & Frost Trucking Co.* v. *Railroad Comm'n*, 271 U. S. 583 (1926); *Speiser* v. *Randall*, 357 U. S. 513 (1958); *Elfbrandt* v. *Russell*, 384 U. S. 11 (1966); *Goldberg* v. *Kelly*, 397 U. S. 254 (1970); *U. S. Dept. of Agriculture* v. *Moreno*, 413 U. S. 528 (1973); *Southeastern Promotions, Ltd.* v. *Conrad*, 420 U. S. 546 (1975). Cf. *Shapiro* v. *Thompson*, 394 U. S. 618 (1969); *Memorial Hospital* v. *Maricopa County*, 415 U. S. 250 (1974).

The Medicaid program cannot be distinguished from these other statutory schemes that unconstitutionally burdened

fundamental rights.[6]   Here, as in *Sherbert,* the government
withholds financial benefits in a manner that discourages the
exercise of a due process liberty: The indigent woman who
chooses to assert her constitutional right to have an abortion
can do so only on pain of sacrificing health-care benefits to
which she would otherwise be entitled.   Over 50 years ago,
Mr. Justice Sutherland, writing for the Court in *Frost &
Frost Trucking Co.* v. *Railroad Comm'n, supra,* at 593–594,
made the following observation, which is as true now as it was
then:

> "It would be a palpable incongruity to strike down an
> act of state legislation which, by words of express di-
> vestment, seeks to strip the citizen of rights guaranteed
> by the federal Constitution, but to uphold an act by

---

[6] The Court rather summarily rejects the argument that the Hyde
Amendment unconstitutionally penalizes the woman's exercise of her right
to choose an abortion with the comment that "[a] refusal to fund pro-
tected activity, without more, cannot be equated with the imposition of
a 'penalty' on that activity." *Ante,* at 317, n. 19.   To begin with, the
Court overlooks the fact that there is "more" than a simple refusal to
fund a protected activity in this case; instead, there is a program that
selectively funds but one of two choices of a constitutionally protected
decision, thereby penalizing the election of the disfavored option.

Moreover, it is no answer to assert that no "penalty" is being im-
posed because the State is only refusing to pay for the specific costs of
the protected activity rather than withholding other Medicaid benefits
to which the recipient would be entitled or taking some other action more
readily characterized as "punitive."   Surely the Government could not
provide free transportation to the polling booths only for those citizens
who vote for Democratic candidates, even though the failure to provide
the same benefit to Republicans "represents simply a refusal to subsidize
certain protected conduct," *ibid.,* and does not involve the denial of any
other governmental benefits.   Whether the State withholds only the spe-
cial costs of a disfavored option or penalizes the individual more broadly
for the manner in which she exercises her choice, it cannot interfere with
a constitutionally protected decision through the coercive use of govern-
mental largesse.

which the same result is accomplished under the guise of a surrender of a right in exchange for a valuable privilege which the state threatens otherwise to withhold. It is not necessary to challenge the proposition that, as a general rule, the state, having power to deny a privilege altogether, may grant it upon such conditions as it sees fit to impose. But the power of the state in that respect is not unlimited; and one of the limitations is that it may not impose conditions which require the relinquishment of constitutional rights. If the state may compel the surrender of one constitutional right as a condition of its favor, it may, in like manner, compel a surrender of all. It is inconceivable that guaranties embedded in the Constitution of the United States may thus be manipulated out of existence."

I respectfully dissent.

MR. JUSTICE MARSHALL, dissenting.*

Three years ago, in *Maher* v. *Roe,* 432 U. S. 464 (1977), the Court upheld a state program that excluded nontherapeutic abortions from a welfare program that generally subsidized the medical expenses incidental to pregnancy and childbirth. At that time, I expressed my fear "that the Court's decisions will be an invitation to public officials, already under extraordinary pressure from well-financed and carefully orchestrated lobbying campaigns, to approve more such restrictions" on governmental funding for abortion. *Id.,* at 462 (dissenting both in *Maher* v. *Roe, supra,* and in *Beal* v. *Doe,* 432 U. S. 438 (1977), and *Poelker* v. *Doe,* 432 U. S. 519 (1977)).

---

*[This opinion applies also to No. 79–4, *Williams et al.* v. *Zbaraz et al.,* No. 79–5, *Miller, Acting Director, Illinois Department of Public Aid, et al.* v. *Zbaraz et al.,* and No. 79–491, *United States* v. *Zbaraz et al., post,* p. 358.]

That fear has proved justified. Under the Hyde Amendment, federal funding is denied for abortions that are medically necessary and that are necessary to avert severe and permanent damage to the health of the mother. The Court's opinion studiously avoids recognizing the undeniable fact that for women eligible for Medicaid—poor women—denial of a Medicaid-funded abortion is equivalent to denial of legal abortion altogether. By definition, these women do not have the money to pay for an abortion themselves. If abortion is medically necessary and a funded abortion is unavailable, they must resort to back-alley butchers, attempt to induce an abortion themselves by crude and dangerous methods, or suffer the serious medical consequences of attempting to carry the fetus to term. Because legal abortion is not a realistic option for such women, the predictable result of the Hyde Amendment will be a significant increase in the number of poor women who will die or suffer significant health damage because of an inability to procure necessary medical services.

The legislation before us is the product of an effort to deny to the poor the constitutional right recognized in *Roe* v. *Wade,* 410 U. S. 113 (1973), even though the cost may be serious and long-lasting health damage. As my Brother STEVENS has demonstrated, see *post,* p. 349 (dissenting opinion), the premise underlying the Hyde Amendment was repudiated in *Roe* v. *Wade,* where the Court made clear that the state interest in protecting fetal life cannot justify jeopardizing the life or health of the mother. The denial of Medicaid benefits to individuals who meet all the statutory criteria for eligibility, solely because the treatment that is medically necessary involves the exercise of the fundamental right to chose abortion, is a form of discrimination repugnant to the equal protection of the laws guaranteed by the Constitution. The Court's decision today marks a retreat from *Roe* v. *Wade* and represents a cruel blow to the most powerless members of our society. I dissent.

## I

In its present form, the Hyde Amendment restricts federal funding for abortion to cases in which "the life of the mother would be endangered if the fetus were carried to term" and "for such medical procedures necessary for the victims of rape or incest when such rape or incest has been reported promptly to a law enforcement agency or public health service." See *ante,* at 302. Federal funding is thus unavailable even when severe and long-lasting health damage to the mother is a virtual certainty. Nor are federal funds available when severe health damage, or even death, will result to the fetus if it is carried to term.

The record developed below reveals that the standards set forth in the Hyde Amendment exclude the majority of cases in which the medical profession would recommend abortion as medically necessary. Indeed, in States that have adopted a standard more restrictive than the "medically necessary" test of the Medicaid Act, the number of funded abortions has decreased by over 98%. App. 289.

The impact of the Hyde Amendment on indigent women falls into four major categories. First, the Hyde Amendment prohibits federal funding for abortions that are necessary in order to protect the health and sometimes the life of the mother. Numerous conditions—such as cancer, rheumatic fever, diabetes, malnutrition, phlebitis, sickle cell anemia, and heart disease—substantially increase the risks associated with pregnancy or are themselves aggravated by pregnancy. Such conditions may make an abortion medically necessary in the judgment of a physician, but cannot be funded under the Hyde Amendment. Further, the health risks of undergoing an abortion increase dramatically as pregnancy becomes more advanced. By the time a pregnancy has progressed to the point where a physician is able to certify that it endangers the life of the mother, it is in many cases too late to prevent her death because abortion is no

340

longer safe. There are also instances in which a woman's life will not be immediately threatened by carrying the pregnancy to term, but aggravation of another medical condition will significantly shorten her life expectancy. These cases as well are not fundable under the Hyde Amendment.

Second, federal funding is denied in cases in which severe mental disturbances will be created by unwanted pregnancies. The result of such psychological disturbances may be suicide, attempts at self-abortion, or child abuse. The Hyde Amendment makes no provision for funding in such cases.

Third, the Hyde Amendment denies funding for the majority of women whose pregnancies have been caused by rape or incest. The prerequisite of a report within 60 days serves to exclude those who are afraid of recounting what has happened or are in fear of unsympathetic treatment by the authorities. Such a requirement is, of course, especially burdensome for the indigent, who may be least likely to be aware that a rapid report to the authorities is indispensable in order for them to be able to obtain an abortion.

Finally, federal funding is unavailable in cases in which it is known that the fetus itself will be unable to survive. In a number of situations it is possible to determine in advance that the fetus will suffer an early death if carried to term. The Hyde Amendment, purportedly designed to safeguard "the legitimate governmental objective of protecting potential life," *ante,* at 325, excludes federal funding in such cases.

An optimistic estimate indicates that as many as 100 excess deaths may occur each year as a result of the Hyde Amendment.[1] The record contains no estimate of the health damage that may occur to poor women, but it shows that it will be considerable.[2]

---

[1] See App. 294–296.

[2] For example, the number of serious complications deriving from abortions was estimated to be about 100 times the number of deaths from abortions. See *id.,* at 200.

## II

The Court resolves the equal protection issue in this case through a relentlessly formalistic catechism. Adhering to its "two-tiered" approach to equal protection, the Court first decides that so-called strict scrutiny is not required because the Hyde Amendment does not violate the Due Process Clause and is not predicated on a constitutionally suspect classification. Therefore, "the validity of classification must be sustained unless 'the classification rests on grounds wholly irrelevant to the achievement of [any legitimate governmental] objective.'" *Ante,* at 322 (bracketed material in original), quoting *McGowan* v. *Maryland,* 366 U. S. 420, 425 (1961). Observing that previous cases have recognized "the legitimate governmental objective of protecting potential life," *ante,* at 325, the Court concludes that the Hyde Amendment "establishe[s] incentives that make childbirth a more attractive alternative than abortion for persons eligible for Medicaid," *ibid.,* and is therefore rationally related to that governmental interest.

I continue to believe that the rigid "two-tiered" approach is inappropriate and that the Constitution requires a more exacting standard of review than mere rationality in cases such as this one. Further, in my judgment the Hyde Amendment cannot pass constitutional muster even under the rational-basis standard of review.

### A

This case is perhaps the most dramatic illustration to date of the deficiencies in the Court's obsolete "two-tiered" approach to the Equal Protection Clause. See *San Antonio Independent School Dist.* v. *Rodriguez,* 411 U. S. 1, 98–110 (1973) (MARSHALL, J., dissenting); *Massachusetts Bd. of Retirement* v. *Murgia,* 427 U. S. 307, 318–321 (1976) (MARSHALL, J., dissenting); *Maher* v. *Roe,* 432 U. S., at 457–458 (MARSHALL, J., dissenting); *Vance* v. *Bradley,* 440 U. S. 93,

113–115 (1979) (MARSHALL, J., dissenting).[3] With all deference, I am unable to understand how the Court can afford the same level of scrutiny to the legislation involved here—whose cruel impact falls exclusively on indigent pregnant women— that it has given to legislation distinguishing opticians from opthalmologists, or to other legislation that makes distinctions between economic interests more than able to protect themselves in the political process. See *ante*, at 326, citing *Williamson* v. *Lee Optical Co.*, 348 U. S. 483 (1955). Heightened scrutiny of legislative classifications has always been designed to protect groups "saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." *San Antonio Independent School Dist.* v. *Rodriguez, supra*, at 28.[4] And while it is now clear that traditional "strict scrutiny" is unavailable to protect the poor against classifications that disfavor them, *Dandridge* v. *Williams*, 397 U. S. 471 (1970), I do not believe that legislation that imposes a crushing burden on indigent women can be treated with the same deference given to legislation distinguishing among business interests.

---

[3] A number of individual Justices have expressed discomfort with the two-tiered approach, and I am pleased to observe that its hold on the law may be waning. See *Craig* v. *Boren*, 429 U. S. 190, 210–211, and n. * (1976) (POWELL, J., concurring); *id.*, at 211–212 (STEVENS, J., concurring); *post*, at 352, n. 4 (STEVENS, J., dissenting). Further, the Court has adopted an "intermediate" level of scrutiny for a variety of classifications. See *Trimble* v. *Gordon*, 430 U. S. 762 (1977) (illegitimacy); *Craig* v. *Boren, supra* (sex discrimination); *Foley* v. *Connelie*, 435 U. S. 291 (1978) (alienage). Cf. *University of California Regents* v. *Bakke*, 438 U. S. 265, 324 (1978) (opinion of BRENNAN, WHITE, MARSHALL, and BLACKMUN, JJ.) (affirmative action).

[4] For this reason the Court has on occasion suggested that classifications discriminating against the poor are subject to special scrutiny under the Fifth and Fourteenth Amendments. See *McDonald* v. *Board of Election*, 394 U. S. 802, 807 (1969); *Harper* v. *Virginia Bd. of Elections*, 383 U. S. 663, 668 (1966).

## B

The Hyde Amendment, of course, distinguishes between medically necessary abortions and other medically necessary expenses.[5]  As I explained in *Maher* v. *Roe, supra,* such classifications must be assessed by weighing " 'the importance of the governmental benefits denied, the character of the class, and the asserted state interests,' " *id.,* at 458, quoting *Massachusetts Bd. of Retirement* v. *Murgia, supra,* at 322.  Under that approach, the Hyde Amendment is clearly invalid.[6]

As in *Maher,* the governmental benefits at issue here are "of absolutely vital importance in the lives of the recipients." *Maher* v. *Roe, supra,* at 458 (MARSHALL, J., dissenting).  An indigent woman denied governmental funding for a medically necessary abortion is confronted with two grotesque choices. First, she may seek to obtain "an illegal abortion that poses a serious threat to her health and even her life."  432 U. S., at 458.  Alternatively, she may attempt to bear the child, a course that may both significantly threaten her health and eliminate any chance she might have had "to control the direction of her own life," *id.,* at 459.

The class burdened by the Hyde Amendment consists of indigent women, a substantial proportion of whom are members of minority races.  As I observed in *Maher,* nonwhite women obtain abortions at nearly double the rate of whites, *ibid.*  In my view, the fact that the burden of the Hyde Amendment falls exclusively on financially destitute women

---

[5] As my Brother STEVENS suggests, see *post,* at 355, n. 8 (dissenting opinion), the denial of funding for those few medically necessary services that are excluded from the Medicaid program is based on a desire to conserve federal funds, not on a desire to penalize those who suffer the excluded disabilities.

[6] In practical effect, my approach is not in this context dissimilar to that taken in *Craig* v. *Boren, supra,* at 197, where the Court referred to an intermediate standard of review requiring that classifications "must serve important governmental objectives and must be substantially related to achievement of those objectives."

suggests "a special condition, which tends seriously to curtail the operation of those political processes ordinarily to be relied upon to protect minorities, and which may call for a correspondingly more searching judicial inquiry." *United States* v. *Carolene Products Co.,* 304 U. S. 144, 153, n. 4 (1938). For this reason, I continue to believe that "a showing that state action has a devastating impact on the lives of minority racial groups must be relevant" for purposes of equal protection analysis. *Jefferson* v. *Hackney,* 406 U. S. 535, 575–576 (1972) (MARSHALL, J., dissenting).

As I explained in *Maher,* the asserted state interest in protecting potential life is insufficient to "outweigh the deprivation or serious discouragement of a vital constitutional right of especial importance to poor and minority women." 432 U. S., at 461. In *Maher,* the Court found a permissible state interest in encouraging normal childbirth. *Id.,* at 477–479. The governmental interest in the present case is substantially weaker than in *Maher,* for under the Hyde Amendment funding is refused even in cases in which normal childbirth will not result: one can scarcely speak of "normal childbirth" in cases where the fetus will die shortly after birth, or in which the mother's life will be shortened or her health otherwise gravely impaired by the birth. Nevertheless, the Hyde Amendment denies funding even in such cases. In these circumstances, I am unable to see how even a minimally rational legislature could conclude that the interest in fetal life outweighs the brutal effect of the Hyde Amendment on indigent women. Moreover, both the legislation in *Maher* and the Hyde Amendment were designed to deprive poor and minority women of the constitutional right to choose abortion. That purpose is not constitutionally permitted under *Roe* v. *Wade.*

## C

Although I would abandon the strict-scrutiny/rational-basis dichotomy in equal protection analysis, it is by no

means necessary to reject that traditional approach to conclude, as I do, that the Hyde Amendment is a denial of equal protection. My Brother BRENNAN has demonstrated that the Amendment is unconstitutional because it impermissibly infringes upon the individual's constitutional right to decide whether to terminate a pregnancy. See *ante*, at 332–334 (dissenting opinion). And as my Brother STEVENS demonstrates, see *post*, at 350–352 (dissenting opinion), the Government's interest in protecting fetal life is not a legitimate one when it is in conflict with "the preservation of the life or health of the mother," *Roe* v. *Wade*, 410 U. S., at 165, and when the Government's effort to make serious health damage to the mother "a more attractive alternative than abortion," *ante*, at 325, does not rationally promote the governmental interest in encouraging normal childbirth.

The Court treats this case as though it were controlled by *Maher*. To the contrary, this case is the mirror image of *Maher*. The result in *Maher* turned on the fact that the legislation there under consideration discouraged only non-therapeutic, or medically unnecessary, abortions. In the Court's view, denial of Medicaid funding for nontherapeutic abortions was not a denial of equal protection because Medicaid funds were available only for medically necessary procedures. Thus the plaintiffs were seeking benefits which were not available to others similarly situated. I continue to believe that *Maher* was wrongly decided. But it is apparent that while the plaintiffs in *Maher* were seeking a benefit not available to others similarly situated, appellees are protesting their exclusion from a benefit that is available to all others similarly situated. This, it need hardly be said, is a crucial difference for equal protection purposes.

Under Title XIX and the Hyde Amendment, funding is available for essentially all necessary medical treatment for the poor. Appellees have met the statutory requirements for eligibility, but they are excluded because the treatment that is medically necessary involves the exercise of a funda-

mental right, the right to choose an abortion. In short, these appellees have been deprived of a governmental benefit for which they are otherwise eligible, solely because they have attempted to exercise a constitutional right. The interest asserted by the Government, the protection of fetal life, has been declared constitutionally subordinate to appellees' interest in preserving their lives and health by obtaining medically necessary treatment. *Roe* v. *Wade, supra.* And finally, the purpose of the legislation was to discourage the exercise of the fundamental right. In such circumstances the Hyde Amendment must be invalidated because it does not meet even the rational-basis standard of review.

## III

The consequences of today's opinion—consequences to which the Court seems oblivious—are not difficult to predict. Pregnant women denied the funding necessary to procure abortions will be restricted to two alternatives. First, they can carry the fetus to term—even though that route may result in severe injury or death to the mother, the fetus, or both. If that course appears intolerable, they can resort to self-induced abortions or attempt to obtain illegal abortions—not because bearing a child would be inconvenient, but because it is necessary in order to protect their health.[7] The result will not be to protect what the Court describes as "the legitimate governmental objective of protecting potential life," *ante,* at 325, but to ensure the destruction of both fetal and maternal life. "There is another world 'out there,' the existence of which the Court . . . either chooses to ignore or fears

---

[7] Of course, some poor women will attempt to raise the funds necessary to obtain a lawful abortion. A court recently found that those who were fortunate enough to do so had to resort to "not paying rent or utility bills, pawning household goods, diverting food and clothing money, or journeying to another state to obtain lower rates or fraudulently use a relative's insurance policy. . . . [S]ome patients were driven to theft." *Women's Health Services, Inc.* v. *Maher,* 482 F. Supp. 725, 731, n. 9.

to recognize." *Beal v. Doe,* 432 U. S., at 463 (BLACKMUN, J., dissenting). In my view, it is only by blinding itself to that other world that the Court can reach the result it announces today.

Ultimately, the result reached today may be traced to the Court's unwillingness to apply the constraints of the Constitution to decisions involving the expenditure of governmental funds. In today's decision, as in *Maher v. Roe,* the Court suggests that a withholding of funding imposes no real obstacle to a woman deciding whether to exercise her constitutionally protected procreative choice, even though the Government is prepared to fund all other medically necessary expenses, including the expenses of childbirth. The Court perceives this result as simply a distinction between a "limitation on governmental power" and "an affirmative funding obligation." *Ante,* at 318. For a poor person attempting to exercise her "right" to freedom of choice, the difference is imperceptible. As my Brother BRENNAN has shown, see *ante,* at 332–334 (dissenting opinion), the differential distribution of incentives—which the Court concedes is present here, see *ante,* at 325—can have precisely the same effect as an outright prohibition. It is no more sufficient an answer here than it was in *Roe v. Wade* to say that " 'the appropriate forum' " for the resolution of sensitive policy choices is the legislature. See *ante,* at 326, quoting *Maher v. Roe,* at 479.

More than 35 years ago, Mr. Justice Jackson observed that the "task of translating the majestic generalities of the Bill of Rights . . . into concrete restraints on officials dealing with the problems of the twentieth century, is one to disturb self-confidence." *West Virginia State Bd. of Education v. Barnette,* 319 U. S. 624, 639 (1943). These constitutional principles, he observed for the Court, "grew in soil which also produced a philosophy that the individual['s] . . . liberty was attainable through mere absence of governmental restraints." *Ibid.* Those principles must be "transplant[ed] . . . to a soil in which the *laissez-faire* concept or principle of non-

interference has withered at least as to economic affairs, and social advancements are increasingly sought through closer integration of society and through expanded and strengthened governmental controls." *Id.,* at 640.

In this case, the Federal Government has taken upon itself the burden of financing practically all medically necessary expenditures. One category of medically necessary expenditure has been singled out for exclusion, and the sole basis for the exclusion is a premise repudiated for purposes of constitutional law in *Roe* v. *Wade.* The consequence is a devastating impact on the lives and health of poor women. I do not believe that a Constitution committed to the equal protection of the laws can tolerate this result. I dissent.

Mr. Justice Blackmun, dissenting.*

I join the dissent of Mr. Justice Brennan and agree wholeheartedly with his and Mr. Justice Stevens' respective observations and descriptions of what the Court is doing in this latest round of "abortion cases." I need add only that I find what I said in dissent in *Beal* v. *Doe,* 432 U. S. 438, 462 (1977), and its two companion cases, *Maher* v. *Roe,* 432 U. S. 464 (1977), and *Poelker* v. *Doe,* 432 U. S. 519 (1977), continues for me to be equally pertinent and equally applicable in these Hyde Amendment cases. There is "condescension" in the Court's holding that "she may go elsewhere for her abortion"; this is "disingenuous and alarming"; the Government "punitively impresses upon a needy minority its own concepts of the socially desirable, the publicly acceptable, and the morally sound"; the "financial argument, of course, is specious"; there truly is "another world 'out there,' the existence of which the Court, I suspect, either chooses to ignore

---

*[This opinion applies also to No 79–4, *Williams et al.* v *Zbaraz et al.,* No. 79–5, *Miller, Acting Director, Illinois Department of Public Aid, et al.* v *Zbaraz et al.,* and No. 79–491, *United States* v. *Zbaraz et al., post,* p. 358.]

or fears to recognize"; the "cancer of poverty will continue to grow"; and "the lot of the poorest among us," once again, and still, is not to be bettered.

Mr. Justice Stevens, dissenting.*

"The federal sovereign, like the States, must govern impartially. The concept of equal justice under law is served by the Fifth Amendment's guarantee of due process, as well as by the Equal Protection Clause of the Fourteenth Amendment." *Hampton* v. *Mow Sun Wong,* 426 U. S. 88, 100. When the sovereign provides a special benefit or a special protection for a class of persons, it must define the membership in the class by neutral criteria; it may not make special exceptions for reasons that are constitutionally insufficient.

These cases involve the pool of benefits that Congress created by enacting Title XIX of the Social Security Act in 1965. Individuals who satisfy two neutral statutory criteria—financial need and medical need—are entitled to equal access to that pool. The question is whether certain persons who satisfy those criteria may be denied access to benefits solely because they must exercise the constitutional right to have an abortion in order to obtain the medical care they need. Our prior cases plainly dictate the answer to that question.

A fundamentally different question was decided in *Maher* v. *Roe,* 432 U. S. 464. Unlike these plaintiffs, the plaintiffs in *Maher* did not satisfy the neutral criterion of medical need; they sought a subsidy for nontherapeutic abortions— medical procedures which by definition they did not need. In rejecting that claim, the Court held that their constitutional right to choose that procedure did not impose a duty on

---

*[This opinion applies also to No. 79–4, *Williams et al.* v. *Zbaraz et al.,* No. 79–5, *Miller, Acting Director, Illinois Department of Public Aid, et al.* v. *Zbaraz et al.,* and No. 79–491, *United States* v. *Zbaraz et al., post,* p. 358.]

the State to subsidize the exercise of that right. Nor did the fact that the State had undertaken to pay for the necessary medical care associated with childbirth require the State also to pay for abortions that were not necessary; for only necessary medical procedures satisfied the neutral statutory criteria. Nontherapeutic abortions were simply outside the ambit of the medical benefits program. Thus, in *Maher,* the plaintiffs' desire to exercise a constitutional right gave rise to neither special access nor special exclusion from the pool of benefits created by Title XIX.

These cases involve a special exclusion of women who, by definition, are confronted with a choice between two serious harms: serious health damage to themselves on the one hand and abortion on the other. The competing interests are the interest in maternal health and the interest in protecting potential human life. It is now part of our law that the pregnant woman's decision as to which of these conflicting interests shall prevail is entitled to constitutional protection.[1]

In *Roe* v. *Wade,* 410 U. S. 113, and *Doe* v. *Bolton,* 410 U. S. 179, the Court recognized that the States have a legitimate and protectible interest in potential human life. 410 U. S., at 162. But the Court explicitly held that prior to fetal viability that interest may not justify any governmental burden on the woman's choice to have an abortion[2] nor even any

---

[1] "In *Roe* v. *Wade,* 410 U. S. 113, the Court held that a woman's right to decide whether to abort a pregnancy is entitled to constitutional protection. That decision . . . is now part of our law. . . ." *Planned Parenthood of Central Missouri* v. *Danforth,* 428 U. S. 52, 101 (STEVENS, J., concurring in part and dissenting in part).

[2] *Roe* v. *Wade* involved Texas statutes making it a crime to "procure an abortion," except when attempted to save the pregnant woman's life. 410 U. S., at 117–118. *Doe* v. *Bolton* involved the somewhat less onerous Georgia statutes making abortion a crime in most circumstances, the exceptions being abortions to save the pregnant woman from life or permanent health endangerment, cases in which there was a very likely irremediable birth defect in the child, and cases in which the pregnancy was

regulation of abortion except in furtherance of the State's interest in the woman's health. In effect, the Court held that a woman's freedom to elect to have an abortion prior to viability has absolute constitutional protection, subject only to valid health regulations. Indeed, in *Roe* v. *Wade* the Court held that even after fetal viability, a State may "regulate, and even proscribe, abortion *except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." Id.,* at 165 (emphasis added). We have a duty to respect that holding. The Court simply shirks that duty in this case.

If a woman has a constitutional right to place a higher value on avoiding either serious harm to her own health or perhaps an abnormal childbirth [3] than on protecting potential life, the exercise of that right cannot provide the basis for the denial of a benefit to which she would otherwise be entitled. The Court's sterile equal protection analysis evades this critical though simple point. The Court focuses exclusively on the "legitimate interest in protecting the potential life of the fetus." *Ante,* at 324. It concludes that since the Hyde Amendments further that interest, the exclusion they create is rational and therefore constitutional. But it is mis-

---

the result of rape. Those exceptions were subject to burdensome prior medical approvals, which were held to be unconstitutional. Subsequent cases have invalidated other burdens on the pregnant woman's free choice to abort. See *Planned Parenthood of Central Missouri* v. *Danforth, supra* (consent required of husband or, for an unmarried woman under 18, of a parent); *Bellotti* v. *Baird,* 443 U. S. 622 (consent required of either parent or superior court judge for an unmarried woman under 18).

[3] The Court rests heavily on the premise—recognized in both *Roe* and *Maher*—that the State's legitimate interest in preserving potential life provides a sufficient justification for funding medical services that are necessarily associated with normal childbirth without also funding abortions that are not medically necessary. The *Maher* opinion repeatedly referred to the policy of favoring "normal childbirth." See 432 U. S., at 477, 478, 479. But this case involves a refusal to fund abortions which are medically necessary to avoid abnormal childbirth.

leading to speak of the Government's legitimate interest in the fetus without reference to the context in which that interest was held to be legitimate. For *Roe* v. *Wade* squarely held that the States may not protect that interest when a conflict with the interest in a pregnant woman's health exists. It is thus perfectly clear that neither the Federal Government nor the States may exclude a woman from medical benefits to which she would otherwise be entitled solely to further an interest in potential life when a physician, "in appropriate medical judgment," certifies that an abortion is necessary "for the preservation of the life or health of the mother." *Roe* v. *Wade, supra,* at 165. The Court totally fails to explain why this reasoning is not dispositive here.[4]

---

[4] These cases thus illustrate the flaw in the method of equal protection analysis by which one chooses among alternative "levels of scrutiny" and then determines whether the extent to which a particular legislative measure furthers a given governmental objective transcends the predetermined threshold. See *Craig* v. *Boren,* 429 U. S. 190, 211–212 (STEVENS, J., concurring). That method may simply bypass the real issue. The relevant question in these cases is whether the Court must attach greater weight to the individual's interest in being included in the class than to the governmental interest in keeping the individual out. Since *Roe* v. *Wade* squarely held that the individual interest in the freedom to elect an abortion and the state interest in protecting maternal health *both* outweigh the State's interest in protecting potential life prior to viability, the Court's "equal protection analysis" is doubly erroneous.

In responding to my analysis of this case, MR. JUSTICE WHITE has described the constitutional right recognized in *Roe* v. *Wade* as "the right to choose to undergo an abortion without coercive interference by the government" or a right "only to be free from unreasonable official interference with private choice." *Ante,* at 327, 328. No such language is found in the *Roe* opinion itself. Rather, that case squarely held that state interference is unreasonable if it attaches a greater importance to the interest in potential life than to the interest in protecting the mother's health. One could with equal justification describe the right protected by the First Amendment as the right to make speeches without coercive interference by the government and then sustain a government subsidy for all medically needy persons except those who publicly advocate a change of administration.

It cannot be denied that the harm inflicted upon women in the excluded class is grievous.[5] As the Court's comparison of the differing forms of the Hyde Amendment that have

[5] The record is replete with examples of serious physical harm. See, e. g., Judge Dooling's opinion in *McRae* v. *Califano*, 491 F. Supp. 630, 670:

"Women, particularly young women, suffering from diabetes are likely to experience high risks of health damage to themselves and their fetuses; the woman may become blind through the worsening during pregnancy of a diabetic retinopathy; in the case, particularly, of the juvenile diabetic, Dr. Eliot testified there is evidence that a series of pregnancies advances the diabetes faster; given an aggravated diabetic condition, other risks increased through pregnancy are kidney problems, and vascular problems of the extremities."

See also the affidavit of Jane Doe in No. 79–1268:

"3. I am 25 years old. I am married with four living children. Following the birth of my third child in November of 1976, I developed a serious case of phlebitis from which I have not completely recovered. Carrying another pregnancy to term would greatly aggravate this condition and increase the risk of blood clots to the lung.

"4. On July 29, 1977, I went to the Fertility Control Clinic at St. Paul-Ramsey Hospital, St. Paul, Minnesota to request an abortion. They informed me that a new law prohibits any federal reimbursement for abortions except those necessary to save the life of the mother and that they cannot afford to do this operation free for me.

"5. I cannot afford to pay for an abortion myself, and without Medicaid reimbursement, I cannot obtain a safe, legal abortion. According to the doctor, Dr. Jane E. Hodgson, without an abortion I might suffer serious and permanent health problems." App. in No. 79–1268, pp. 109–110.

And see the case of the Jane Doe in Nos. 79–4, 79–5, and 79–491, as recounted in Dr. Zbaraz' affidavit:

"Jane Doe is 38 years old and has had nine previous pregnancies. She has a history of varicose veins and thrombophlebitis (blood clots) of the left leg. The varicose veins can be, and in her case were, caused by multiple pregnancies: the weight of the uterus on her pelvic veins increased the blood pressure in the veins of her lower extremities; those veins dilated and her circulation was impaired, resulting in thrombophlebitis of her left leg. The varicosities of her lower extremities became so severe that they required partial surgical removal in 1973.

"2. Given this medical history, Jane Doe's varicose veins are almost

been enacted since 1976 demonstrates, the Court expressly approves the exclusion of benefits in "instances where severe and long-lasting physical health damage to the mother" is the predictable consequence of carrying the pregnancy to term. Indeed, as the Solicitor General acknowledged with commendable candor, the logic of the Court's position would justify a holding that it would be constitutional to deny funding to a medically and financially needy person even if abortion were the only lifesaving medical procedure available.[6] Because a denial of benefits for medically necessary abortions inevitably causes serious harm to the excluded women, it is tantamount to severe punishment.[7] In my judgment, that denial cannot be justified unless government may, in effect, punish women who want abortions. But as the Court unequivocally held in *Roe* v. *Wade,* this the government may not do.

---

certain to recur if she continues her pregnancy. Such a recurrence would require a second operative procedure for their removal. Given her medical history, there is also about a 30% risk that her thrombophlebitis will recur during the pregnancy in the form of 'deep vein' thrombophlebitis (the surface veins of her left leg having previously been partially removed). This condition would impair circulation and might require prolonged hospitalization with bed rest.

"3. Considering Jane Doe's medical history of varicose veins and thrombophlebitis, particularly against the background of her age and multiple pregnancies, it is my view that an abortion is medically necessary for her, though not necessary to preserve her life." App. in Nos. 79–4, 79–5, and 79–491, p. 92.

[6] "QUESTION: Mr. Solicitor General, would you make the same rational basis argument if the Hyde amendment did not contain the exception for endangering the life of the mother, if it was her death rather than adverse impact on her health that was involved?

"Mr McCREE: I think I would." Tr. of Oral Arg. in 79–1268, p. 10.

[7] In this respect, these cases are entirely different from *Maher*, in which the Court repeatedly noted that the refusal to subsidize nontherapeutic abortions would merely result in normal childbirth. Surely the government may properly presume that no harm will ensue from normal childbirth.

Nor can it be argued that the exclusion of this type of medically necessary treatment of the indigent can be justified on fiscal grounds. There are some especially costly forms of treatment that may reasonably be excluded from the program in order to preserve the assets in the pool and extend its benefits to the maximum number of needy persons. Fiscal considerations may compel certain difficult choices in order to improve the protection afforded to the entire benefited class.[8] But, ironically, the exclusion of medically necessary abortions harms the entire class as well as its specific victims. For the records in both *McRae* and *Zbaraz* demonstrate that the cost of an abortion is only a small fraction of the costs associated with childbirth.[9] Thus, the decision to tolerate harm to indi-

---

[8] This rationale may satisfactorily explain the exclusions from the Medicaid program noted by the Court. *Ante*, at 325, n. 28. In all events, it is safe to assume that those exclusions would conserve the assets of the pool.

[9] In the *Zbaraz* case, Judge Grady found that the average cost to the State of Illinois of an abortion was less than $150 as compared with the cost of a childbirth which exceeded $1,350. App. to Juris. Statement in No. 79–491, p. 14a, n. 8.

Indeed, based on an estimated cost of providing support to children of indigent parents together with their estimate of the number of medically necessary abortions that would be funded but for the Hyde Amendment, appellees in the *Zbaraz* case contend that in the State of Illinois alone the effect of the Hyde Amendment is to impose a cost of about $20,000,000 per year on the public fisc. Brief for Appellees in Nos. 79–4, 79–5, and 79–491, p. 60, n.

See also Judge Dooling's conclusion:

"While the debate [on the Hyde Amendment] in both years was on a rider to the departmental appropriations bill, it was quickly established that the restriction on abortion funding was not an economy measure: it was recognized that if an abortion was not performed for a medicaid eligible woman, the medicaid and other costs of childbearing and nurture would greatly exceed the cost of abortion. Opponents of funding restriction were equally at pains, however, to make clear that they did not favor funding abortion as a means of reducing the Government's social welfare costs." 491 F. Supp., at 644.

gent persons who need an abortion in order to avoid "serious and long-lasting health damage" is one that is financed by draining money out of the pool that is used to fund all other necessary medical procedures. Unlike most invidious classifications, this discrimination harms not only its direct victims but also the remainder of the class of needy persons that the pool was designed to benefit.

In *Maher* the Court stated:

> "The Constitution imposes no obligation on the States to pay the pregnancy-related medical expenses of indigent women, or indeed to pay any of the medical expenses of indigents. But when a State decides to alleviate some of the hardships of poverty by providing medical care, the manner in which it dispenses benefits is subject to constitutional limitations." 432 U. S., at 469–470 (footnote omitted).

Having decided to alleviate some of the hardships of poverty by providing necessary medical care, the government must use neutral criteria in distributing benefits. It may not deny benefits to a financially and medically needy person simply because he is a Republican, a Catholic, or an Oriental— or because he has spoken against a program the government has a legitimate interest in furthering. In sum, it may not create exceptions for the sole purpose of furthering a governmental interest that is constitutionally subordinate to the individual interest that the entire program was designed to protect. The Hyde Amendments not only exclude financially and medically needy persons from the pool of benefits for a constitutionally insufficient reason; they also require the expenditure of millions and millions of dollars in order to thwart the exercise of a constitutional right, thereby effectively inflicting serious and long-lasting harm on impoverished women who want and need abortions for valid medical reasons. In my judgment, these Amendments constitute an unjustifiable,

and indeed blatant, violation of the sovereign's duty to govern impartially.[10]

I respectfully dissent.

---

[10] My conclusion that the Hyde Amendments violate the Federal Government's duty of impartiality applies equally to the Illinois statute at issue in *Zbaraz*.