# Constitutionality of Section 7(b)(3) of the Emergency Veterans' Job Training Act of 1983

The statute's exclusion of religious activities from the ambit of activities for which the Veterans' Administration may fund training does not violate the Free Exercise Clause.

The statute's inclusion in the program of institutions that are religiously-affiliated but not pervasively sectarian does not violate the Establishment Clause. The inclusion of pervasively sectarian institutions is also constitutional, so long as the selection of the institution is the result of the genuinely independent and private choice of the veteran.

The Veterans' Administration may constitutionally prescribe by regulation criteria to distinguish between religious and nonreligious activities

General considerations that may aid in promulgating regulations to distinguish between religious and nonreligious activities include, at a minimum, (1) whether the activity is also traditionally performed in nonreligious organizations and (2) the degree to which the activity is informed and affected by the religious tenets of the organization.

January 23, 1989

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
VETERANS' ADMINISTRATION

This memorandum responds to your request that we assess the constitutionality of section 7(b)(3) of the Emergency Veterans' Job Training Act of 1983 ("VJTA"), 29 U.S.C. § 1721 note (Supp. III 1985).[1] That section excludes from a proposed program of job training "employment which involves political or religious activities." Specifically, you have asked whether "Congress, under the Free Exercise Clause of the Constitution, as a condition of authorization of payments to employers under the VJTA program, [may] require the VA to determine that the veteran's employment does not involve religious activities." Memorandum at 7. Assuming the answer is yes — that Congress may exclude veterans seeking employment performing religious activities from the program — you request our view about whether "the VA constitutionally may establish, by regulation, criteria for ascertaining which activities of an employer are religious activities similar to those enunciated by the lower court in *Amos v. Corporation of Presiding Bishop*, 594 F. Supp. 791 (D. Utah 1984), *rev'd*

---

[1] *See* Memorandum for Charles J Cooper, Assistant Attorney General, Office of Legal Counsel, from Donald L Ivers, General Counsel, Veterans' Administration ("VA") (Oct 1, 1987) ("Memorandum")

*on other grounds*, 483 U.S. 327 (1987), and/or those formally applied in the CETA program." *Id.* If not, you wish us to advise you as to which "type of criteria would be constitutionally permissible." *Id.* at 7-8.[2] We conclude that Congress may refuse to pay to train veterans to perform religious activities without violating the Free Exercise Clause, because the federal government is under no obligation to subsidize the exercise of constitutional rights. We then address whether the Establishment Clause prohibits religiously-affiliated institutions and a narrower class of religious institutions labelled "pervasively sectarian" by the Supreme Court from participating in the VJTA program. We conclude that both religiously-affiliated and pervasively sectarian institutions may participate in the program and may train veterans for nonreligious activities. Finally, we conclude that the VA may constitutionally fashion criteria to distinguish between religious and nonreligious activities and we then set forth general considerations that may aid in promulgating regulations to distinguish between such activities.

## I. The Emergency Veterans' Job Training Act of 1983

The VJTA establishes a program "defraying the costs of necessary training" of eligible veterans for "stable and permanent positions that involve significant training." Section 4(a). Any veteran from the Korean conflict or the Vietnam era who "is unemployed at the time of applying" or who has "been unemployed for at least 10 of the 15 weeks immediately preceding the date of [his] application" is eligible for participation in the program. *Id.* § 5(a)(1)(A) and (B). An eligible veteran submits an application to the Administrator supporting his eligibility. If the Administrator approves the application, the veteran is given a "certificate of that veteran's eligibility for presentation to an employer offering a program of job training under this Act." *Id.* § 5(b)(3)(A). The veteran takes that certificate to an employer of his choice whose job training program has been approved by the Administrator as satisfying certain criteria. The employer can then be reimbursed directly with government funds for one-half of the wages it pays to the veteran up to $10,000. *Id.* § 8(a)(2).

Any employer program of job training meeting the statutory criteria is to be approved for participation in the program. Those criteria require, among other things, that the employer plan to employ the veteran in the

---

[2] You also asked us to consider the implications of a determination that the Free Exercise Clause bars Congress from excluding religious activities from the program. In that event you sought our advice whether the VA could "disregard so much of section 7(b)(3) of the VJTA as bars approval of programs of job training for employment involving religious activities and make direct payments to employers without being in violation of the prohibitions of the first amendment to the Constitution regarding establishment of a religion." Memorandum at 7 Because we conclude that Congress *may* constitutionally exclude training for employment performing religious activities from the program, we do not address this question in precisely this context.

position for which he is being trained; that the wages paid to the veteran cannot be less than the wages paid to "other employees participating in a comparable program of job training"; and that employment of the veteran under the program cannot result in the "displacement of currently employed workers." *Id.* § 7(d)(2) and (3)(A). Excluded from consideration are programs of job training for "seasonal, intermittent, or temporary jobs," for employment where commissions are the primary source of income, and for employment in the Federal Government. *Id.* § 7(b)(1). Also excluded are those programs training "for employment which involves political or religious activities." *Id.* § 7(b)(3).[3] The latter restriction, by intentionally excluding "religious activities," gives rise to your question whether such "discrimination" violates the Free Exercise Clause of the First Amendment.

## II. The Free Exercise Clause of the First Amendment

We believe that Congress' decision to exclude religious activities from those it will fund under its job training program for veterans does not violate the Free Exercise Clause for two related reasons. As a matter of original understanding (an understanding which is reflected in recent Supreme Court decisions), the Free Exercise Clause is aimed primarily at prohibitory laws forbidding or preventing the practice of religion. Congress' refusal to fund religious activities does not constitute such a direct prohibition. More generally, it is now well established that the government does not unconstitutionally circumscribe an individual's exercise of a constitutional right merely by refusing to pay for that exercise. While the Supreme Court held in *Sherbert v. Verner*, 374 U.S. 398 (1963), that denying a government benefit to an individual on account of his exercise of religion is unconstitutional, it has also made clear that refusing to fund religious activities does not violate the Free Exercise Clause. Accordingly, Congress' decision not to subsidize the training of veterans to perform religious activities does not violate the Free Exercise Clause.

> The First Amendment provides:
>
> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

U.S. Const. amend. I.

---

[3] Nothing in the legislative history addresses the issue of why Congress chose to exclude religious activities from the VJTA program.

First, it should be noted that only laws "prohibiting" the free exercise of religion are enjoined, and not those "respecting" or "abridging" it. This is a somewhat narrower prescription. "Prohibit" unequivocally means, and meant at the time of the founding, "[t]o forbid; to interdict by authority ... [t]o debar; to hinder." Samuel Johnson, *A Dictionary of the English Language* (1755). *See* Noah Webster, *American Dictionary of the English Language* (1828). "Abridge" can mean to "contract, to diminish, to cut short" or it can mean "[t]o deprive of; in which sense it is followed by the particle *from*, or *of*, preceding the thing taken away." Samuel Johnson, *A Dictionary of the English Language* (1755) (emphasis in original). The word "abridging" as used in the First Amendment is not followed by the "particle from or of." As the Supreme Court has recognized, by using the word "prohibiting" in the Free Exercise Clause and "abridging" elsewhere in the First Amendment, the Framers were placing different limits on Congress' authority to enact different types of laws. *See Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 451 (1988) ("The crucial word in the constitutional text is 'prohibit ....'"). This language, when read in historical context, leads to the conclusion that in drafting the Free Exercise Clause the Framers were enjoining primarily prohibitory laws forbidding or preventing the practice of religion.

Moreover, the history of the Free Exercise Clause suggests that it was meant to enjoin prohibitory laws.[4] At the time the Constitution was drafted, as the Court has put it, "Catholics found themselves hounded and proscribed because of their faith; Quakers who followed their conscience went to jail; Baptists were peculiarly obnoxious to certain dominant Protestant sects; men and women of varied faiths who happened to be in a minority in a particular locality were persecuted because they steadfastly persisted in worshipping God only as their own consciences dictated." *Everson v. Board of Educ.*, 330 U.S. 1, 10 (1947) (footnote omitted). The abhorrence of this sort of conduct gave rise to the religion

---

[4] Examples of prohibitory laws are those mandating attendance at approved services, expelling religious nonconformists, requiring support for the established church, and imprisoning those preaching unpopular doctrines *See* Chester James Antieau *et al.*, *Freedom from Federal Establishment* 16-29 (1964).

[5] This conclusion is supported by the origins of the clause. In explaining the religion clauses, the Court has often looked to Thomas Jefferson's Virginia Bill for Religious Liberty as an earlier statement of the ideas embodied within them *McGowan v. Maryland*, 366 U.S. 420, 437 (1961); *Everson*, 330 U.S. at 12-13, *Reynolds v. United States*, 98 U.S. 145, 163-64 (1878). The Bill for Religious Liberty provided in part

> That no man shall be *compelled* to frequent or support any religious worship, place, or ministry whatsoever, nor shall be *enforced, restrained, molested* or *burthened* in his body or goods, nor shall otherwise suffer on account of his religious opinions or belief[ ]

Act for Establishing Religious Freedom, ch. XXXIV, 1823 Va. Acts 86 (Hening) (emphasis added) *quoted in Everson*, 330 U.S. at 13 Similarly, the principal sponsor of the First Amendment, James Madison, said its purpose was to ensure "that Congress should not establish a religion, and enforce the legal observation of it by law, nor compel men to worship God in any manner contrary to their conscience." 1 Annals of Cong 758 (Joseph Gales ed., 1789)

clauses of the First Amendment. *Bowen v. Roy*, 476 U.S. 693, 703 (1986) (opinion of Burger, C.J., joined by Powell and Rehnquist, JJ.).[5]

Thus, the origins, the history and the language suggest that the First Amendment enjoins only relatively direct prohibitions of the free exercise of religion.[6] The Court's recent decisions reflect this interpretation. *See, e.g., Lyng*, 485 U.S. at 451, (quoting *Sherbert*, 374 U.S. at 412 (Douglas, J., concurring)) ("'the Free Exercise Clause is written in terms of what the government cannot do to the individual, not in terms of what the individual can exact from the government'"); *Bowen*, 476 U.S. at 706 (plurality opinion) ("[G]overnment regulation that indirectly and incidentally calls for a choice between securing a governmental benefit and adherence to religious beliefs is wholly different from governmental action or legislation that criminalizes religiously inspired activity or inescapably compels conduct that some find objectionable for religious reasons.").

The constitutionality of Congress' decision not to subsidize the training of veterans to perform religious activities is also apparent from cases that address generally the validity of refusing to subsidize constitutional rights. The Court has made plain that the government does not "penalize" a decision to exercise a constitutional right simply by refusing to pay for it. Two cases most clearly elucidate this distinction between a refusal to subsidize constitutionally-protected activity and an unconstitutional condition. In *Maher v. Roe*, 432 U.S. 464 (1977), and *Harris v. McRae*, 448 U.S. 297 (1980), the Court faced challenges to government decisions not to fund abortions. The Court held that notwithstanding the judicially-articulated constitutional right to an abortion under *Roe v. Wade*, 410 U.S. 113 (1973), neither the state nor the federal government had an obligation to fund abortions — even those that were "therapeutic."

The *Harris* Court specifically met and rejected the argument that *Sherbert* made mandatory the funding of the exercise of a constitutional

---

[6] That the government has in place a general program for job training for veterans does not change the nature of the prohibition from an indirect to a direct one. For example, the Court held in *Johnson v Robison*, 415 U S 361 (1974), that denial of special veterans' benefits to a conscientious objector was constitutionally permissible. There, a conscientious objector who had performed alternative civilian service challenged the federal funding scheme granting educational benefits only to veterans who had served in active duty. He argued that this denial of benefits "interferes with his free exercise of religion by increasing the price he must pay for adherence to his religious beliefs " *Id* at 383. The Court rejected this argument, saying-

> The withholding of educational benefits involves only an incidental burden upon appellee's free exercise of religion — if, indeed, any burden exists at all  Appellee and his class were not included in this class of beneficiaries, not because of any legislative design to interfere with their free exercise of religion, but because to do so would not rationally promote the Act's purposes .  [T]he Government's substantial interest in raising and supporting armies, Art I, § 8, is of "a kind and weight" clearly sufficient to sustain the challenged legislation, for the burden upon appellee's free exercise of religion — the denial of the economic value of veterans' educational benefits under the Act — is not nearly of the same order or magnitude as the infringement upon free exercise of religion suffered by petitioners in *Gillette*

*Id.* at 385-86 (citations and footnote omitted)

35

right. In *Sherbert*, the Supreme Court held that a statute making ineligible for unemployment benefits an employee who had been forced to leave her job because of religious reasons violated the Free Exercise Clause. The *Harris* Court said:

> The appellees argue that the Hyde Amendment is unconstitutional because it "penalizes" the exercise of a woman's choice to terminate a pregnancy by [an] abortion. In *Maher*, the Court found only a "semantic difference" between the argument that Connecticut's refusal to subsidize non-therapeutic abortions "unduly interfere[d]" with the exercise of the constitutional liberty recognized in *Wade* and the argument that it "penalized" the exercise of that liberty. 432 U.S., at 474, n.8. And, regardless of how the claim was characterized, the *Maher* Court rejected the argument that Connecticut's refusal to subsidize protected conduct, without more, impinged on the constitutional freedom of choice. This reasoning is equally applicable in the present case. A substantial constitutional question would arise if Congress had attempted to withhold all Medicaid benefits from an otherwise eligible candidate simply because that candidate had exercised her constitutionally protected freedom to terminate her pregnancy by abortion. This would be analogous to *Sherbert* v. *Verner*, 374 U.S. 398, where this Court held that a State may not, consistent with the First and Fourteenth Amendments, withhold *all* unemployment compensation benefits from a claimant who would otherwise be eligible for such benefits but for the fact that she is unwilling to work one day per week on her Sabbath. But the Hyde Amendment, unlike the statute at issue in *Sherbert*, does not provide for such a broad disqualification from receipt of public benefits. Rather, the Hyde Amendment, like the Connecticut welfare provision at issue in *Maher*, represents simply a refusal to subsidize certain protected conduct. A refusal to fund protected activity, without more, cannot be equated with the imposition of a "penalty" on that activity.

*Harris*, 448 U.S. at 317 n.19 (citations omitted).

Congress has chosen to create a program to subsidize the training of veterans so that they may be employed in a variety of nonreligious, nongovernmental, nonpolitical jobs. The program neither proscribes a religious practice nor compels any practice contrary to any religious beliefs. First, no veteran is compelled to do that which he might choose not to do on religious grounds. Nor is Congress punishing those choosing to exer-

cise their rights. It is simply refusing to subsidize the exercise of those rights. No veteran is made ineligible for all veterans' benefits by virtue of his constitutionally-protected determination to seek employment involving a religious activity. Like the Hyde amendment and the Connecticut welfare provision in *Maher*, and unlike the statute in *Sherbert*, the VJTA represents no more than a refusal to fund a protected activity.[7]

In short, although the Constitution "affords protection against unwarranted government interference" with certain freedoms, "it does not confer an entitlement to such funds as may be necessary to realize all the advantages of that freedom. To hold otherwise would mark a drastic change in our understanding of the Constitution." *Harris*, 448 U.S. at 317-18. To paraphrase Justice Stewart in *Harris*, it cannot be that because government may not prohibit individuals from engaging in certain religious activities, government therefore has an affirmative constitutional obligation to ensure that all persons have the financial resources to fulfill their religious obligations or to perform religious tasks. *Id.*

### III. Participation of Religiously-Affiliated and "Pervasively Sectarian Institutions" in the VJTA Program

Having concluded that the VJTA does not violate the Free Exercise Clause, we now turn to the question of which institutions may participate in the VJTA program. We first address whether religiously-affiliated institutions in general may participate in the VJTA program so long as the funds are provided for training veterans to perform non-religious activities. We then address whether a narrower class of religious institutions labelled "pervasively sectarian" by the Supreme Court may participate under the same conditions. We conclude that two recent Supreme Court cases interpreting the Establishment Clause, *Bowen v. Kendrick*, 487 U.S. 589 (1988) and *Witters v. Washington Dep't of Servs. for the Blind*, 474 U.S. 481 (1986), make clear that religiously-affiliated employers may participate in the VJTA program and may train veterans for nonreligious activities. While the question is closer, we believe that, under the analysis set forth in *Witters* pervasively sectarian employers may participate under the same conditions.

---

[7] Nor does the VJTA place an "obstacle[]" in the path of the veteran seeking employment performing a religious activity. *Maher*, 432 U S. at 474. The veteran who seeks such employment "suffers no disadvantage as a consequence" of Congress' decision to subsidize the training of other veterans at other activities. *Id.* Congress may not have eased other difficulties in obtaining employment performing a religious activity, such as the veteran's lack of qualifications or the market conditions, but these difficulties were "neither created nor in any way affected" by the VJTA *Id* Eligible veterans are free to choose to enroll in the program or not. They are free to choose, within certain limitations, the type of activity for which they wish to be trained. Nothing prevents them from pursuing their chosen profession, whether it is in government, performing a political activity, or training for the ministry.

37

## A. *Training Veterans for Nonreligious Activities by Religiously-affiliated Institutions*

In *Kendrick*, 487 U.S. 589 (1988), decided last term, the Court upheld a federally funded program providing for the involvement of religious institutions in counseling adolescents about premarital sex. The Court noted that it had "never held that religious institutions are disabled by the First Amendment from participating in publicly sponsored social welfare programs." *Id.* at 609. Only if a statute provides for "direct government aid to religiously-affiliated institutions [with] ... the primary effect of advancing religion" is it unconstitutional. *Id.* Also, in *Witters*, 474 U.S. 481 (1989), the Court upheld a vocational rehabilitation program aiding the blind even though government aid was used to subsidize a student at a private Christian college who was studying to become a pastor, missionary or youth director. That the money ended up in the coffers of the religious institution mattered not at all, said the Court, where the "aid ... ultimately flow[ing] to religious institutions does so only as a result of the genuinely independent and private choices of aid recipients." *Id.* at 487.

Applying the three-part test of *Lemon v. Kurtzman*, 403 U.S. 602 (1971), in light of these two cases makes clear that religiously-affiliated institutions may participate in this program to train eligible veterans to work in nonreligious activities. First, under the *Lemon* standard, courts may invalidate a statute only if it is "motivated wholly by an impermissible purpose," *Kendrick*, 487 U.S. at 602. That is certainly not the case here; the program has a clear secular purpose: the elimination or reduction of unemployment among veterans. *Id.*

Nor is the primary effect of including religiously-affiliated institutions in the program to advance religion: only training for nonreligious activities is included in the program. Moreover, as in *Witters*, that the aid ultimately benefits the religious institution is due primarily to the choice the eligible veteran makes to take his certificate to a religiously-affiliated employer. That the funds are paid directly to an employer at the veteran's behest and do not pass through the veteran's hands does not change the character of the program.[8] The program is "'made available generally without regard to the sectarian-nonsectarian, or public-nonpublic nature of the institution benefited,' and is in no way skewed towards religion." *Witters*, 474 U.S. at 487-88 (quoting *Committee for Pub. Educ. & Religious Liberty v. Nyquist*, 413 U.S. at 782-83 n.38). In fact, here it is deliberately directed away from religion: funding religious activities is expressly prohibited by statute. By no means can the VJTA be said to "create [a] financial incentive for" eligible veterans to undertake a religious activity, nor does it "provide greater or broader benefits" to recipients who choose to work in religious organizations. *Id.* at 488.

---

[8] This point is discussed in greater detail *infra* at p. 41.

> On the contrary, aid recipients have full opportunity to expend vocational rehabilitation aid on wholly secular education, and as a practical matter have rather greater prospects to do so. Aid recipients' choices are made among a huge variety of possible careers, of which only a small handful are sectarian.

*Id.* Finally, "[t]he function of the ... program is hardly 'to provide desired financial support for nonpublic, sectarian institutions.'" *Id.* (quoting *Nyquist*, 413 U.S. at 783).

We believe that the program also passes the third prong of the *Lemon* test, which prohibits excessive entanglement, as that prong has recently been interpreted in *Kendrick*, 487 U.S. at 615-16. The *Kendrick* Court squarely rejected the argument that including religious institutions in neutral programs subsidizing the performance of secular tasks may lead to an "'excessive government entanglement with religion.'" *Id.* at 615 (quoting *Lemon*, 403 U.S. at 613). Noting that this prong of the *Lemon* test had been much criticized over the years, the *Kendrick* Court explained that cases finding entanglement had mostly involved aid to parochial schools, which were "pervasively sectarian" and had "'as a substantial purpose the inculcation of religious values.'" *Id.* at 616 (quoting *Aquilar v. Felton*, 473 U.S. 402, 411 (1985)). By contrast, the Court noted that there was no reason to assume that the religious institutions eligible for government funds are pervasively sectarian and thus no reason to fear that the kind of monitoring required to assure that public money is spent in a constitutional manner will lead to excessive entanglement. *Id.*

## B. "Pervasively Sectarian" Institutions

Thus far we have determined that under *Kendrick* and *Witters* the VA may reimburse religiously-affiliated institutions for training veterans for employment performing nonreligious activities. There is, however, some tension between these two cases as to whether the VA may also include within the program what the Court refers to as "pervasively sectarian" institutions. The Court has at times examined the nature of the religious institution and refused to allow government monies to go to institutions "in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission." *Hunt v. NcNair*, 413 U.S. 734, 743 (1973).[9] For example, in *Kendrick* the majority seemed to indicate that the "entanglement" prong of the *Lemon* test forbids including pervasively sectarian institutions even within programs designating funding for "specific secular purposes." 487 U.S. at 610.

---

[9] In *Roemer v. Board of Pub Works*, 426 U.S 736 (1976), the Court defined a "pervasively sectarian" institution somewhat tautologically as an institution "so permeated by religion that the secular side cannot be separated from the sectarian " *Id.* at 758-59 (quoting the district court, 387 F. Supp. at 1293)

All of the members of the Court, however, do not share this view: there is considerable disagreement among them about the significance of a determination that an organization is "pervasively sectarian." There is some suggestion in Chief Justice Rehnquist's majority opinion in *Kendrick* that the class of "pervasively sectarian" institutions is limited to parochial schools. *Kendrick*, 487 U.S. at 611. Moreover, Justice Kennedy, in his concurring opinion in *Kendrick* for himself and Justice Scalia, indicates some skepticism about the utility of the "pervasively sectarian" concept and suggests that the significant determination is not the nature of the institution but how the money given by the federal government is spent. As Justice Kennedy puts it, "[t]he question in an as-applied challenge is not whether the entity is of a religious character, but how it spends its grant." *Id.* The separate concurrence of Justice O'Connor also suggests that the proper inquiry is whether any public funds have been used to promote religion. *Id.* at 623.

Even Justices Blackmun, Brennan, Marshall and Stevens in their dissent in *Kendrick* indicated that "the Constitution does not prohibit the government from supporting secular social-welfare services solely because they are provided by a religiously-affiliated organization." 487 U.S. at 640.[10] Thus, the dissent in *Kendrick* suggests the importance of evaluating the substantive nature of the use of public funds.[11]

We need not, however, resolve the differing viewpoints among the Justices in *Kendrick* as to whether the proper focus of the inquiry is on the institution or on the use to which the money is put because we believe that *Witters* is controlling in this context. Because *Witters* makes clear that funds from a government program similar in almost every respect to the VJTA can be used for training in *religious* activities, a fortiori VJTA funds can be used for training in *nonreligious* activities even if performed for pervasively sectarian institutions. Many of the similarities between the program in *Witters* and the VJTA program have already been set forth above. Both programs involve government funding for an "unmistakably secular purpose"; "no more than a minuscule amount of the aid awarded under [each] program is likely to flow to religious education"; no one can suggest that the "'actual purpose' in creating the program[s] was to endorse religion"; despite the direct payment under the

---

[10] Significantly, the dissent noted

There is a very real and important difference between running a soup kitchen or a hospital, and counseling [clients] on how to make the difficult decisions facing them. The risk of advancing religion at public expense, and of creating an appearance that the government is endorsing the medium and the message, is much greater when the religious organization is directly engaged in pedagogy, with the express intent of shaping belief and changing behavior, than where it is neutrally dispensing medication, food, or shelter.

*Kendrick*, 487 U S at 641 (Blackmun, J., dissenting) (footnote omitted).

[11] Confusingly, the dissent also indicated that the label "pervasively sectarian" may serve in some cases as a proxy for a more detailed analysis of the institution, the nature of the aid, and the manner in which the aid may be used *Kendrick*, 487 U.S at 633 (Blackmun, J., dissenting). *See also Roemer*, 426 U.S. at 758.

VJTA, the choice of recipient is made by the veteran, thus "[a]ny aid provided under [the] program[s] that ultimately flows to religious institutions does so only as a result of the genuinely independent and private choices of [the] aid recipient[]"; and the programs are "'made available generally without regard to the sectarian-nonsectarian, or public-nonpublic nature of the institution benefited,' and [are] in no way skewed towards religion." *Witters*, 474 U.S. at 485-88 (quoting *Wallace v. Jaffree*, 472 U.S. 38, 74 (1985) and *Committee for Pub. Educ. & Religious Liberty v. Nyquist*, 413 U.S. at 782-83 n.38). Finally, in both programs the funds are specific reimbursement for costs previously incurred, not cash or in-kind grants with the effect "'of a direct subsidy to the religious [institution]' from the State." *Id.* at 487 (quoting *Grand Rapids Sch. Dist. v. Ball*, 473 U.S. 373, 394 (1985)).[12]

The only difference between the VJTA and the program upheld in *Witters* is that here the money is paid directly to the pervasively sectarian institution employing the veteran, while in the vocational rehabilitation program challenged in *Witters*, the vocational assistance was paid directly to the student, who transmitted it to the educational institution of his choice. The difference between the program upheld in *Witters* and this one, however, is wholly formal: while the name of a pervasively sectarian organization appears on a government check in the VJTA but not the *Witters* program, in both programs the religious employer providing the training receives the money "as a result of the genuinely independent and private choices of" the aid recipient. *Id.* at 487. Thus, as in *Witters*, "it does not seem appropriate to view any aid ultimately flowing to the (pervasively sectarian institution) as resulting from a state action sponsoring or subsidizing religion. Nor does the mere circumstance that petitioner has chosen to use neutrally available state aid to help pay for his religious education confer any message of state endorsement of religion." *Id.* at 488-89. Accordingly, regardless of the possibly pervasively sectarian identity of the recipient of the government's check, the VJTA program is constitutional under the analysis in *Witters* because the veteran, not the government, is choosing the recipient of the funds.[13] Thus, we believe that the Establishment Clause does not erect barriers to any institution's participation in the VJTA program for training in nonreligious activities.[14]

---

[12] These similarities distinguish the VJTA from programs reimbursing parochial schools for part of the salaries of teachers who teach both secular and sectarian subjects, *Grand Rapids Sch. Dist v Ball*, 473 U S 373 (1985), as well as programs where government-employed teachers provide remedial services to parochial school students on parochial school grounds, *Aguilar*, 473 U S at 412. In those and in most of the other cases involving government aid to parochial schools, the court looked to the amount and percentage of funds going to parochial schools. Where the principal beneficiaries of an aid program are religious institutions, the Court often infers that its purpose is to endorse religion, and thus invalidates the program. Here, the purpose of the program is to aid veterans, and no more than a "miniscule amount of the aid awarded" will go to pervasively religious institutions. *Witters*, 474 U S. at 486

[13] The decision to pay the monies directly to the employer rather than to the veteran is unexplained in the legislative history, but its purpose could be to reduce administrative costs or the possibility of fraud

41

## IV. Distinguishing Religious From Nonreligious Activities

Having concluded that religiously-affiliated and pervasively sectarian institutions are eligible for participation in the VJTA program, we turn to the question of "which criteria ... the VA [may] constitutionally prescribe by regulation for rendering a determination of the nature of the involved activity." Memorandum at 3. If, as noted above, "religious institutions are [not] disabled by the First Amendment from participating in publicly sponsored social welfare programs," *Kendrick*, 487 U.S. at 609, and yet they must carry out their responsibilities in a "lawful, secular manner," *id.* at 612, then government is inevitably charged with the task of distinguishing between that which is nonreligious and that which is religious. Moreover, *Kendrick* makes plain that "the very supervision of the aid to assure that it does not further religion [does not] render[] the statute invalid." *Id.* at 615. The problem for the government therefore is how to distinguish objectively those activities that are religious from those activities that are not.[15]

In reviewing applications to determine whether an activity is "religious," one important objective signpost the VA should consider is whether the activity is also traditionally performed in nonreligious organizations. Such a requirement would not only serve the goal of the job training program by making the veteran more employable generally, it would also say something "objective" about the activity in question. But meeting this requirement is not sufficient by itself to make an activity nonreligious; the activity performed by the veteran must also be scrutinized in its organizational context. To illustrate: a nonreligious organization may employ a person whose responsibility is to ensure that its employees behave in a manner consistent with the goals and values of the organization (*e.g.*, a disciplinary officer of a fraternal organization); such a position in a religiously-

---

[14] You have not asked specifically whether the VA may choose to exclude all positions at religious institutions or more narrowly, all positions at pervasively sectarian institutions from the program to avoid the need to distinguish between religious and nonreligious activities. Such a position may seem superficially attractive to avoid running afoul of the Establishment Clause as interpreted by the Supreme Court. Having decided that the Establishment Clause does not prohibit religious institutions from participating in the program, however, we think it appropriate to emphasize, that the language of the statute is unequivocal in excluding only "religious *activities*." Section 7(a)(2) of the VJTA provides that the Administrator "shall approve a proposed program of job training of an employer" unless the program does not meet the criteria set by section 7(b). This language does not vest unfettered discretion in the Administrator, it suggests only that those programs failing to meet the requirements of section 7(b) may be excluded. Veterans seeking training for nonreligious activities by religious institutions are thus presumably entitled by statute to have religious employers reimbursed for training them.

[15] Justice Brennan pointed out the problem inherent in the very enterprise where government seeks to distinguish between such activities in his concurrence in *Corporation of Presiding Bishop v Amos*, 483 U.S 327, 340-46 (1987). He there said

> What makes the application of a religious-secular distinction difficult is that the character of an activity is not self-evident. As a result, determining whether an activity is religious or secular requires a searching case-by-case analysis.

*Id.* at 343.

affiliated organization may be too intertwined with the organization's religious tenets to be characterized as nonreligious.

Thus, the degree to which the activity is informed and affected by the religious tenets of the organization might also be a relevant factor. *Amos*, 594 F. Supp. 791, 799 (D. Utah 1984), *rev'd on other grounds*, 483 U.S. 327 (1987) (Court should examine "the nexus between the primary function of the activity in question and the religious rituals or tenets of the religious organization or matters of church administration"). On the other hand, that the activity is mandated by religious tenets is not sufficient by itself to cause that activity to be deemed religious. For example, charity may be required by an organization's religious law, but a position in a religiously-affiliated foundation dispensing the foundation's monies is not, it seems to us, necessarily a religious activity.[16]

The difficulty in distinguishing between religious and nonreligious activities lies in seeking to define that which lies between the two relatively clear ends of a continuum. Thus, while it may seem obvious that activities such as custodial, maintenance and cafeteria services are nonreligious, and that performing sacraments or leading prayer services are overtly religious actions, defining that which lies between is far more difficult.[17] Perhaps the best that can be said is that a religiously-affiliated organization wishing to participate in the job-training program ought to be required to state the specific job or jobs in which the veteran is to be employed, the tasks that job entails, and why it believes the activities in that job can fairly be characterized as nonreligious. This is consistent

---

[16] To take a further example, Jewish law enjoins as a religious matter violations of the law of the nation in which the community lives. J.J. Schacter, *Dina De-Malkhuta Dina A Review*, 1977 Dine' Yisrael Annual 77, 79 ("The Talmudic dictum *dina demalkhuta dina*, the law of the state is law, first formulated by Samuel in the third century C E and thereafter accepted as part of Jewish law was understood in the medieval period to be a legal ratification of th[e] existing state of affairs "). Yet to characterize as performing a "religious activity" every lawyer, accountant, auditor, and other individual employed to ensure that a Jewish organization is adhering to the laws of the United States is plainly to ascribe too much to the religious requirement and to ignore the more obvious reason for performing the activity.

[17] The VA has expressed concern about the decision by the Seventh Circuit that placing CETA workers, who were paid by the government, in certain positions in sectarian schools violated the Establishment Clause. *Decker v O'Donnell*, 661 F 2d 598 (7th Cir. 1980). In that case the court held unconstitutional "[t]he outstationing [by public authorities] of CETA workers in sectarian elementary or secondary schools for the purpose of providing remedial education"; "the placement of CETA workers in instructional positions in summer or recreation or similar programs at sectarian schools"; "instructional positions in adult education programs", "regulation[s] allowing the employment of CETA workers in custodial child care after school hours", the "use of CETA workers in 'diagnostic or therapeutic speech and hearing services'", regulations permitting "CETA employees to provide services relating to the health and safety of the students"; and placement of "CETA workers in '[f]unctions performed with respect to the administration and grading of State-prepared examinations." *O'Donnell*, 661 F2d at 610-13. The *O'Donnell* court struck down even the regulations "allowing CETA workers to provide 'support services for the administration of federally funded or regulated programs made applicable to religious institutions'"; "placements in cafeteria work or other work directly related in the provision of food services to students"; and "the placement of CETA workers in adjunct custodial or maintenance work related to cafeteria work and health services " *Id* at 614.

Continued

with the approach taken by the one court that sought to set forth general criteria as to permissible regulations. Thus, as noted in your memorandum, in *Amos* the district court sought to articulate criteria to determine what activity can be classified as religious. *See Amos*, 594 F. Supp. 791 (D. Utah 1984), *rev'd on other grounds*, 483 U.S. 327 (1987). Generally, the district court suggested examining the nexus between the activity and the religious tenets or rituals of the institution.[18] While inevitably lacking somewhat in specificity, these criteria seem to us, as a general matter, worthy of consideration in the formulation of regulations.

The more specific criteria we set forth above are meant only as examples that ought to be considered in promulgating regulations. They are by no means exclusive. We hope that we have here provided sufficient guidance to enable the VA to begin drafting and formulating regulations distinguishing between religious and nonreligious activities. We stand ready to review such regulations prior to their issuance, and to assist in any other appropriate way.

## Conclusion

The exclusion of religious activities from the ambit of activities for which the VJTA may fund training does not violate the Free Exercise Clause. The exclusion neither prohibits, impedes nor penalizes anyone seeking to perform a religiously-mandated requirement. Second, the inclusion of the institutions in the program that are religiously-affiliated

---

[17] (...continued)

The outcome in *O'Donnell* does not support the argument that these activities became religious merely because they were performed in a pervasively sectarian institution. *O'Donnell* ran afoul of the principle that the "potential for divisive political conflict over the issue of funding" along religious lines may be sufficient to warrant invalidating the program under the Establishment Clause *Id* at 615 That "potential for divisiveness" existed in part because of the nature of the CETA program, which was to give block grants to a designated, finite group of "prim[ary] sponsors" (and their sub-grantees) who were chosen to provide employment to eligible workers. *Id* at 602, 615 This program is thus to be contrasted with the VJTA, which affords any employer meeting the statutory criteria the opportunity to participate in the program Moreover, it is precisely the discretion vested in the government and its grantees under CETA that distinguishes it from the VJTA and the program upheld in *Witters*. As noted above, *Witters* turned on the fact that the beneficiary determined where the money was to go, as is the case with the VJTA. In CETA, the government determined which programs were to receive funds and beneficiaries were encouraged to work for previously-designated institutions This makes CETA a very different program from the one upheld in *Witters* and distinguishes *O'Donnell* from the situation here.

[18] The Supreme Court reversed the district court on the ground that non-profit, church-owned and church-run facilities were exempt from the provisions of title VII prohibiting discrimination on the basis of religion The Court did not address the issue of how best to distinguish between religious and non-religious activities. The *Amos* district court's test is thus unaffected, and seems to us helpful. The court there labeled an activity "religious" if "there is a substantial connection between the activity in question and the religious organization's religious tenets or matters of church administration " *Id.* at 799. However, where "the nexus between the primary function of the activity in question and the religious tenets or rituals of the religious organization or matters of church administration is tenuous or non-existent," for an activity to be religious there must be a "substantial relationship between the employee's job and church administration or the religious organization's rituals or tenets " *Id.*

44

but not pervasively sectarian does not violate the Establishment Clause. Although the question is a closer one, inclusion of pervasively sectarian institutions is also in our view constitutional, so long as the selection of such institution is the result of the genuinely independent and private choice of the veteran. Finally, distinguishing between nonreligious and religious activities, however difficult a task, is here required by statute and is constitutional. Regulations doing so should focus, at a minimum, on the nexus between religious tenets and the job to be undertaken.

DOUGLAS W. KMIEC
*Assistant Attorney General*
*Office of Legal Counsel*
